City of Oakland *v.* Carpentier.

## CITY OF OAKLAND *v.* CARPENTIER *et al.*

CHARTERS of corporations are special grants of power. The corporation has no powers except those expressly given, or which are necessary to the exercise of those expressly given.

The powers delegated by the government to municipal corporations, are trusts, not subject to be delegated by the corporations.

Under the Act of 1852, incorporating the town of Oakland, the corporate and municipal powers were lodged in a Board of Trustees. The Board had power "to lay out, make, open, widen, regulate, and keep in repair, all streets, bridges, ferries, public places, and grounds, wharfs, docks, piers, slips, sewers, and alleys, and to authorize the construction of the same." Under this clause the Board, by ordinance, gave defendant the exclusive privilege of laying out, establishing, constructing, and regulating, wharfs, etc. within the city, for thirty-seven years. *Held,* that the ordinance was void, as being a transfer of the corporate powers of the Board; and that the present city of Oakland, being the successor in law of the town of Oakland, can come into equity to have the ordinance declared void, and the wharfs, etc. held by defendants thereunder, delivered up.

Where the charter of a city vests the corporate powers in a "Board of Trustees to consist of five members, who shall be elected," etc. and the law provides, that "at all meetings of the Board a majority of the Trustees shall constitute a quorum to do business," a majority of those elected can organize and act at the first meeting, as well as at any subsequent meeting.

If defendant, by conspiracy with others, procured them and himself to be elected to the Board of Trustees, for the purpose of defrauding the town of this property and these franchises, for his benefit, the whole transaction is illegal.

And if defendant, as member elect of the Board, neither resigning nor qualifying, took advantage of his position to advance his personal interests, at the expense of those of the corporation, it was a fraud for which equity will hold him responsible.

Nor would a ratification by a subsequent Board, fraudulently elected by defendant's efforts, validate the transaction.

The statute of limitations would not begin to run until after the election of a new and innocent Board.

An equitable action, to set aside a fraudulent deed of real estate, when the effect would be to restore the possession to the defrauded party, is an action for the recovery of real estate, and governed by the Statute of Limitations applicable to such actions.

APPEAL from the Third District.

*Thompson, Irving & Pate,* for Appellant.

1. The deed and ordinances were void, because five Trustees were elected, and only four qualified. If the Board was first legally constituted by the election and qualification of five members, as required by law, (Act May, 1850,) then a majority could perform any official duty; not otherwise. (*Leonard* v. *Darlington,* 6 Cal. 123.) Hence, these deeds and ordinances are void. Where a deed, upon its face, purports to be executed in conformity to law, and the want of authority to execute it does not appear upon the deed, then the Court will declare the deed fraudulent and void, and will direct its cancellation or a reconveyance. (See 2 Story's Eq. 694: 1 Newland on Contracts, Ch. 94, p. 493; 1 Story's Eq. 91.)

2. Had the Board been properly constituted, yet the grant of the exclusive privilege of constructing wharfs, piers, docks, and of regulating the tolls thereon, and receiving the same, was null and void. These were public rights inherent in the corporation, and inalienable by the Trustees. (*Minturn* v. *Larue et al.* McAlister's, C. C. R.; *Charles River Bridge*, 11 Peters, 545; *Fanning* v. *Gregor*, 16 How. 524; *Thatcher* v. *Dartmouth Bridge*, 18 Pick. 501; *Mills* v. *St. Clair*, 8 How. 569; *Susquehanna Canal Company* v. *Bonham*, Sergt. & Rawle.)

3. The charges of fraud in the complaint are sufficient.

4. It is contended that the act of limitations is a bar, and is available on demurrer.

The 17th Section, upon which the Respondent relies, applies only to actions other than those for the recovery of real property. Where suit is instituted for the recovery of real estate, although that real estate may have been obtained by the fraud of the defendant, it cannot be limited by the section relied on, for this would lead to the absurd conclusion that the Legislature meant to shield a possession obtained by fraud, by a limitation shorter than that fixed for the recovery of real property, or its rents, or servitudes, where no fraud exists.

Besides, the suit is instituted against Horace W. Carpentier, a Trustee of an express trust, who has obtained possession of property committed to his charge by a fraudulent combination with his co-Trustees, and hence the statute of limitations is no bar. The case comes up to the principles on which Courts of Equity, in the exercise of their jurisdiction, repudiate the bar of the act of limitations in cases of trust.

*E. W. F. Sloan*, for Respondent.

I. Where a number of persons are intrusted with powers not of a mere private confidence, but partaking of a general nature, when all have met, a majority can conclude a minority, and their act will be that of the whole. The cases of corporations go further; there, it is not necessary they should meet; it is enough if notice be given. (Per Ayre, Ch. J. in *Grindley* v. *Barker*, 1 Bos. & P. 236; *Attorney-General* v. *Davy*, 2 Atkyns, 212; *King* v. *Burton*, 3 T. R. 592; *Rex* v. *Bellringer*, 4 T. R. 822.) Nor can there be any difference in principle or reason, between the case

of a resignation by one member after his election and qualification, and that of a refusal or failure by one to qualify after an election. It seems not to be necessary, even, that the whole number should be elected. (*Matter of the Union Ins.* 22 Wend. 599; *Vide Ex parte Willcocks*, 7 Cow. 408.)

II. As to the fraud, perhaps an act in the nature of a private Act of the Legislature, can be annulled for fraud. (10 Amer. Jurist, 297, and cases cited.) This is not exactly a private act. But Appellant cannot attack the act, and yet claim rights under it. The fraud alleged in passing the ordinances, and in making the conveyances to Carpentier, are vague. How can a Court notice it? What is the injury to Oakland? It nowhere appears that the grant of the land or wharf privileges was made without consideration, or upon inadequate consideration. The grant was "upon conditions." Carpentier was to construct the wharfs at his own expense, and it does not appear that these conditions were unfair to the town, or that C. has failed to perform them. Neither the deed nor the ordinances are set forth. In short, it does not appear from the bill how Oakland has been injured; and courts do not decide on abstract questions. The fraud alleged must have injured some one. (*Chittenden* v. *Craig*, 2 Bibb, 474; 1 Story's Eq. Juris. Sec. 203.) This is a case in which relief can only be granted upon terms. It is a case in which the plaintiff must offer to do equity to the defendants. The bill makes no such offer, and is clearly demurrable for that reason. (1 Story's Eq. Jur. Sec. 64; 2 Id. Secs. 693, 694.) The ratification by ordinance in 1853, was made with a full knowledge of the facts. Chancery has no power to rescind contracts arbitrarily; and where new stipulations have been made concerning them, the Court will not interfere. (3 J. Ch. 23; 17 J. R. 437.; *Sadler* v. *Robinson*, 2 Stew. 510; 1 Story's Eq. Juris. Sec. 203; *Gas Co.* v. *City of San Francisco*, 9 Cal. 453.)

III. The Statute of Limitations constitutes a complete bar to the relief sought; and is available on demurrer. (*Vide* Story's Eq. Plead. Secs. 503, 750, 751; 1 Dan. Ch. Pr. 623, 624, Perk. Ed.;) *Sublette* v. *Tinney*, 9 Cal. 423.) Our Statute of Limitations applies alike to suits in equity and actions at law. It was suggested by counsel for the Appellant, that the case does not fall

within the provisions of the 3d Chapter of the Act of Limitations; that the 2d Chapter is the only one applicable to suits in respect to real estate.   Chapter 2 does not apply to proceedings for the purpose of setting aside legal titles as fraudulent, but to an action for the recovery of possession after a successful determination of the former proceedings.

Whether this case comes within the provisions of Section 19, or the second class in Section 17, it is still barred.

There is no pretense of recent discoveries; on the contrary, whatever is known must have been discovered at the time.

The wharf privilege is but a chattel interest, and clearly falls within the second class of cases mentioned in Section 17.

The right or power of the corporation to demise for a term the right of constructing wharfs, and the taking of wharfage, cannot be questioned.   (Kent's City Charters; *Costar* v. *Brush,* 25 Wend. 631.)

BALDWIN, J. delivered the opinion of the Court—TERRY, C. J. concurring.

This is a bill in equity filed by a municipal corporation to set aside a contract or lease made of certain franchises and real estate.   The bill charges that the city of Oakland is the legal successor of the town of Oakland by Act of the Legislature, passed March 25, 1854.   That the town of Oakland was incorporated by law on the 4th May, 1852, and, by the same Act, was vested with a title to certain lands comprising the water front within the corporate limits; also, with certain privileges touching the erection of wharfs, docks, etc.; that, by the Act incorporating the town of Oakland, the corporate and municipal powers were lodged in a Board of Trustees, to consist of five members, whose election was given to the qualified voters of the town, the election fixed on the second Monday in May in each year, and the term of office one year, and until their successors were qualified.   That an election for Trustees occurred in pursuance of the Act, but only four of them qualified as Trustees; and, at a meeting of the four persons so elected and qualified, a resolution, purporting to be an Ordinance, was passed, whereby the Trustees pretended to convey to one Horace W. Carpentier and his representatives the exclusive right and privilege of con-

structing wharfs, piers, and docks, at any point within the corporate limits of the town of Oakland, with the right of collecting wharfage and dockage as he might deem reasonable, upon certain conditions expressed in the ordinance. That, by this pretended ordinance, and for the considerations therein set forth, a pretended grant was made to the said Carpentier and his assignees or legal representatives, with all the improvements, rights, and interests, belonging to said town, in and to the lands lying within the limits of the town of Oakland. That Carpentier afterwards, by fraud, procured certain men to be elected again as the Board, who ratified this contract; that the first ordinance was fraudulent, Carpentier having procured himself to be elected Trustee for the purpose of getting it and having his agents on the Board of Trustees. Various other charges of fraud are made, some of which will be noticed in the course of the opinion.

The defendants filed a demurrer to the bill. The ground is, that it does not state facts sufficient to show a cause of action, and that the claim of the plaintiff, as stated, is barred by the Statute of Limitations. Final judgment was rendered on the demurrer in favor of the defendants, the plaintiff declining to amend his bill.

Several important questions are raised by the record.

1. Had the Trustees of the town of Oakland power to grant to Carpentier the exclusive right and privilege of constructing wharfs, piers, and docks, at any point within the corporate limits of the town, with the right of collecting wharfage and dockage, at such rates as he might deem reasonable, for the period of thirty-seven years?

The charter of the town of Oakland is to be found in the Acts of 1852, page 180. By Section 3d of that Act it is provided: " The Board of Trustees shall have power to make such by-laws and ordinances as they may deem proper and necessary; to regulate, improve, sell, or otherwise dispose of, the common property; to prevent and extinguish fires; to lay out, make, open, widen, regulate, and keep in repair, all streets, roads, bridges, ferries, public places, and grounds, wharfs, docks, piers, slips, sewers, wells, and alleys, and to authorize the construction of the same, and, with a view to facilitate the construction of wharfs

and other improvements, the lands lying within the limits afore-
said, between high tide and ship channel, are hereby granted
and released to said town; *provided,* that said lands shall be
retained by said town as common property, or disposed of for
the purposes aforesaid; to regulate and collect wharfage and
dockage; to secure the health, cleanliness, ornament, peace, and
good order, of said town; to organize and support common
schools; to license and suppress dram shops, horse-racing, gam-
bling-houses, and houses of ill-fame, and all indecent or im-
moral practices, shows, and amusements; to regulate the loca-
tion of slaughter-houses, stables, and places for the storage of
gunpowder; and to pass such other laws and ordinances as, in
their opinion, the order, good government, and general welfare,
of the town may require."

The rules in relation to the construction of charters of corpora-
tions are familiar. They are special grants of power emanating
from the paramount authority. The corporation, owing its exist-
ence to the law, is precisely what the law makes it. It has no pow-
ers except those expressly given, or which are necessary to the
exercise of those expressly given. The general legislative power
residing in the State Government may delegate to a municipal
government some portion of its own powers; but these grants
are held in subordination to the general power, and are not con-
strued as taking from that government any other powers or
rights than those clearly granted. These delegated powers,
given for local objects, are regarded as trusts confided to the
hands in which they are placed, and are not subject to be dele-
gated by the repositories of them. To this Board of Trustees,
as has been seen, was given power " to lay out, make, open,
widen, regulate, and keep in repair, all streets, roads, bridges,
ferries, public places, and grounds, wharfs, docks, piers, slips,
sewers, and alleys, and to authorize the construction of the
same." Under these general terms it is claimed that this Board
had a right to authorize Carpentier to enjoy the exclusive privi-
lege of laying out, establishing, and constructing, wharfs within
the city at pleasure, and fix the charges, for a period of thirty-
seven years. It is not difficult to see that such a construction is
not warranted by the provisions of this Act. The charge in the
bill is not that Carpentier agreed, or was allowed, to *construct* a

wharf, or any number of wharfs; that, by contract, he was authorized, and bound himself, on certain terms and conditions, to do this; but that to him, in exclusion of the right of everybody else, and of the corporation itself, was imparted the sole privilege, not only of constructing all wharfs, but of laying out, establishing, and regulating, them, too. This amounts, not to the grant of a license or privilege to erect a wharf, or all the wharfs, laid out or ordered by the council, but the grant of an exclusive right to lay out and construct them at his own convenience, in his own way, and to hold and use them on his own terms; and, if he did not choose to exercise this privilege, the corporation is prevented from giving the privilege to any one else; and so of docks, piers, and the like. If, by a sweeping ordinance of this sort, an exclusive and comprehensive privilege like this could be given to Carpentier, it is hard to see why the opening, repairing, and regulating, of streets and roads should not be given to him exclusively, as a privilege, with a right to charge and collect what tolls or charges for using them he might please, since, as has been seen, the very same words apply to these public easements as to docks, and piers, and wharfs. We do not regard this ordinance as an exercise of a power under the charter, but as a transfer of the corporate powers intrusted to this Board to this favored grantee. What power of regulation is left after an unconditional grant of the exclusive privilege of all the wharfs, and docks, and piers, and a lease for thirty-seven years of all the lands, and a right to fix such tolls as the grantees please, and this without any obligation to build or construct any, it is not easy to see. If the grant had been to the city of San Francisco, in the same words, and the city authorities had granted the exclusive privilege to one man to construct all the wharfs along the line of the bay, and fix his own toll, we suppose no one would question that the grant exceeded the powers of the agents of the corporation.

The general power over the wharfs and docks is like the general power over the streets and highways. The corporation must exercise the general powers which the term "regulate" implies. This general power involves the determination of the questions whether a wharf shall be constructed, when, how, in what places, on what terms, how kept, and what charges shall be exacted for

City of Oakland *v.* Carpentier.

the use? These police regulations are essential to the interest of the city, its commerce, its health, possibly, certainly its convenience and general prosperity. It might, as we have intimated, just as well be said that the Board could by ordinance delegate to Carpentier the power of opening all streets and alleys, anywhere in the town, when he chose, or widening them, where he chose; to run an alley through any one's lot, or to make a sewer near any man's door, at his pleasure; but it would be rather a startling proposition to say that he could hold—through an ordinance—the exclusive privilege to do all these things, and charge for them what he chose; and that no one else—nor the town itself—had a right to do any of them. And the same reason precisely which denies the power to make this grant, applies to the grant of the exclusive privilege of constructing all the wharfs he may choose, he determining, of course, where these wharfs shall be, the number, the dimensions, the kind, the toll, and every matter concerning them—comprehended within the term "regulation." The reason is that this power of regulation is a political power, and therefore, the transfer of it is the transfer of a power of municipal legislation; which authority is not in its nature alienable. It is not the transfer of so much property; it is the transfer of a power to create, and control, and regulate, a certain species of franchise, the creation, control, and regulation of which, are powers of the political department. It is no answer to say that after a wharf is constructed by the authority of the corporation, it might be sold as property; the reply to this is, that the establishment of it is of the province of the corporation; and that it can no more give a general privilege to one man to establish wharfs, when, where, and as, he chooses, than it could give the same right to open streets when, where, and as, he chose, within the limits of the city—the privilege being given for his own profits, use, and benefit.

The principle upon which these general views rest, has been fully supported by the United States Circuit Court for the Districts of California, in the case of *Minturn* v. *Larue*, involving the construction of this charter.

The power is given the Board "to regulate and to collect wharfage and dockage"; but this power is not exercised, but ceded, by a grant allowing the grantee to regulate it as he pleases.

It will not do to say that the lands lying between high tide and ship channel, are ceded to the city; this does not deprive the argument of its force, that the establishment of wharfs, docks, etc. is one of its corporate powers, and that no wharf can be so constructed, unless *such wharf* be so laid out by the order, or with the leave, of the corporation—which cannot be by the general cession of a privilege to another to establish, when, where, and how, he pleases. We understand the Supreme Court of Massachusetts, in *Fay, petitioner,* (15 Pick. 255,) to intimate this doctrine, when it is said—speaking of the right of the city of Boston to grant a ferry—"Even if the city, by their authorized agents, had made a grant of a ferry or other franchise, claiming to be owners thereof, with express or implied covenants for an exclusive enjoyment of such franchise, this would not prohibit or restrain the Mayor or Aldermen from exercising the powers vested in them by statute, to license a ferry required by public convenience and necessity. Such authority is vested in them as Trustees for the public, to be exercised for the public good, and cannot be restrained by the covenant of the city, though such covenant happens to be executed by the same agents." But how much stronger would have been the statement of the venerable Judge, C. J. Shaw, if in that case a general grant had been made of the exclusive privilege of establishing all the ferries on a river, or between the shores of Boston and Chelsea, with the right to select the places at which to exercise the privilege, or, if exercised, to charge what ferriage they chose. This would be, not to make the grantee a licensee of a ferry right, but the assignee of the privilege of making and unmaking ferry franchises at pleasure; indeed, it would be transferring all the powers of government over the subject, to one individual.

We see no distinction in this charter between a wharf or dock, in or upon a navigable stream, and a ferry right or bridge. They are all of the same class of interests, and the same powers over all of them are given in the same words.

But if there was a difference, the charter giving this power and right of regulation to this corporation over the subject, it is held as a political power, and must be exercised by those to whom it is confided. The power to lay out and regulate wharfs being given to the council, cannot be exercised by Carpentier.

We think, then, that this general grant of this exclusive privilege is wholly void, as exceeding the powers of this corporation; and that the plaintiff, the successor of the old town, has a right to come into equity to remove this impediment, constituted by these proceedings, from the free and beneficial exercise of its corporate functions and property.     The plaintiff stands here as a Trustee, administering important trusts, and charged with responsible duties to the public, which cannot be safely discharged so long as doubts hang upon its title to property, and to the exercise of its control over its franchises; and, like any other Trustee, has the right to seek the aid of equity to remove obstructions to the performance of its duties.     It is difficult to see how else the plaintiff could vindicate its right.     The claim of the defendants in this respect is incorporeal.     They assert that certain franchises have been ceded to them, and that the plaintiff has parted with them; the plaintiff, claiming only to hold these franchises and the administration of them in trust for the public, would be without any relief, if equity could not aid in removing this difficulty; for it could neither build wharfs nor authorize others to build them, as long as its powers and rights were denied.     Nor do we perceive what form of legal action would give an adequate remedy.

This view disposes of the demurrer, for it is general—going to the whole bill; and if the bill contains, in any part, a complete cause of action, the general objection to it, for want of equity, fails.

What effect the invalidity of this grant of this general privilege has upon the grant of the land, the bill does not enable us to determine.     Neither the ordinance nor the deed is set out, as they should have been, in the bill.     It is charged in the complaint, it is true, that the land between high tide and ship channel, and this exclusive privilege, were conveyed in the same instrument; but in what relation the land stood to this privilege, or what were the particular considerations or inducements to the grant of the land, we are not distinctly informed.     If the land were conveyed merely or mainly to give effect to this illegal purpose, probably the incident would fall with its principal.

The charter is, perhaps, the most defective upon the statute book, and this is saying a great deal.     A perverse ingenuity

seems to have been exercised to make it as lame and loose as possible. The joint labors of Malaprop and Partington could scarcely have made such a collocation or dislocation of words and sentences. Among other things, it gives the Board of Trustees power " *to license and suppress* dram-shops, horse-racing, *gambling-houses, and houses of ill-fame, and all indecent and immoral practices, shows, and amusements.*" However general the words of this charter, the received rules of construction require us to construe them in reference to the substantive purposes expressed. The act gives power " to regulate, improve, sell, or otherwise dispose of, the common property; to prevent and extinguish fires; to lay out, make, open, widen, regulate, and keep in repair, all streets, roads, bridges, ferries, public places, and grounds, wharfs, docks, piers, slips, sewers, wells, and alleys, and to authorize the construction of the same, and with a view to facilitate the construction of wharfs and other improvements, the lands lying within the limits aforesaid, between high tide and ship channel, are hereby granted and released to said town; *provided*, that said lands shall be retained by said town as common property, or disposed of for the purposes aforesaid." Now, looking into this jumble of incoherent and contradictory verbiage, the questions arise: To what *other* improvements, besides wharfs, was it designed that this water-front should be applied? or what are "the purposes aforesaid," for which it might be disposed of and how disposed of? It may well be doubted whether, under this charter, the Town Council, being bound to lay out and regulate these wharfs, streets, and docks, an unconditional sale or lease of the land necessary to be retained to accomplish and give effect to this power could be made, especially if accompanied with this was a renunciation of all dominion or control over the land necessary for the site of these docks, streets, or wharfs. But, perhaps, it is not necessary to decide these points now, as they can be presented more satisfactorily when the facts are better developed.

2. It is contended by the Appellant that this ordinance and deed are void, for the reason that the Board of Trustees were not legally organized; that though five were elected, (Carpentier being one,) all did not qualify; and that, though a majority of the members of such a public body may act after the organization, it requires all the members to make the organization.

Section 2d of the charter is in these words: "The corporate powers and duties of said town shall be vested in a Board of Trustees, to consist of five members, who shall be elected," etc. Nothing is said in this Act further, as to the number required or mode of corporate action. In the first section, the town is declared to be incorporated under the provisions of the Act of 1850, to provide for the incorporation of towns. (C. L. 114.) The third section of this last Act provides that the Board of Trustees shall assemble within ten days after their election, etc.; and, Section 4th: "At all meetings of the Board a majority of the Trustees shall constitute a quorum to do business."

We can see no reason for holding that a majority of the members elected to this Board should not as well be held empowered to act at the first, as at any subsequent, meeting of it.

3. The next question is as to the alleged fraud in procuring this grant by Carpentier. Some astute and forcible criticism is employed by the counsel for the Respondent upon the complaint. The facts are not as fully stated as is desirable in such cases. The complaint is defective in not averring fully the terms of the ordinance and the contract, and the particular injury resulting to the plaintiff from the alleged fraud; nor are the fraudulent practices of the defendant, Carpentier, in procuring the election of the first Board, or his procuring the election of the second, nor the circumstances attending the ratification of the first contract, nor the promises or agreements made by him on or as inducing the execution and delivery of the deed, fully set out. But as the bill may be amended, on the return of the cause, in these particulars, and as the general questions have been discussed, we proceed to consider them.

It is alleged that Carpentier procured men, who were his agents or conspirators with him, to be elected to this Board, for the purpose of getting them to defraud the town, for his benefit, of all this property and these franchises; and if he got himself elected to this place, in order to help the contrivance through, whether by his influence, or by keeping out some one else who might have opposed the scheme, then this was sufficient to brand the whole transaction with illegality. Nay, more, if Carpentier put himself in the position of a member elect of this Board, neither resigning nor qualifying, and took advantage of this po-

sition to advance his personal interests, at the expense of those of the corporation, this was a fraud for which a Court of Equity would hold him responsible. He would occupy the position, really, of a Trustee dealing for his own profit with the subject of the trust, and his conduct would be scrutinized with the jealousy with which equity regards the interested dealings of an agent with the principal, in respect to the subject of the trust. Nor would a ratification by a subsequent Board, if the members were fraudulently elected, or procured to be elected, by Carpentier, have any effect in validating the transaction. Carpentier could not protect his fraud by the sanction of his own associates united to effect, together, an illegal enterprise.

If these facts be made to appear, the Statute of Limitations would not begin to run until after the corporation thus defrauded, got out of the hands of the confederates, and an opportunity were afforded innocent agents coming to the management of the affairs of the town, to look into and ascertain the true state of things. Knowledge on the part of the guilty agents of the corporation of the criminal fact is not notice to the corporation of such fraud, so as to give the advantage of this notice to the equally guilty associate of those agents. If this were the law, an agent could always protect himself by joining in a conspiracy to defraud his principal with a convenient friend, who received the principal's property, and who might claim against the principal that the agent had notice of the fraud.

4. The next and last point is that the Statute of Limitations of three years applies and bars the claim of the plaintiff to set aside this deed. By Art. 17th, Sec. 17, (Wood's Digest, 47,) is given the limitation of certain actions. The section is: "Actions other than those for the recovery of real property can be commenced as follows: * * * within three years. An action for relief on the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

We think that this provision has no relation to an equitable proceeding to set aside a fraudulent deed of real estate when the effect of it is to restore the possession of the premises to the defrauded party. In such a case, the action is substantially an action for the recovery of the real estate; indeed it is literally.

Express fraud, generally, as well avoids a deed at law as in equity, and it would be strange if, after three years, a party could set up the fraud in avoidance of the deed at law, and a different rule prevail in equity. This is really an action for the recovery of real estate, and the plaintiff is no worse off because fraud has been committed upon him, nor the defendant in any better situation, than if the latter had innocently bought and entered under an imperfect title.

For the reasons assigned, the judgment below must be reversed, and the cause remanded for further proceedings, in accordance with this opinion.

On petition for rehearing, BALDWIN, J. delivered the following opinion—FIELD, C. J. concurring:

Petition for rehearing denied. The opinion modified so as to leave open for future revision the question of the validity of the contract with Carpentier, under the ordinance referred to in the opinion.