ILLINOIS, The (The ELLEN HOLGATE. v.). See Case No. 4,376.

ILLINOIS. The (McFADDEN v.). See Case No. 8,784.

ILLINOIS, The (NALL v.). See Case No. 10,005.

ILLINOIS & MISS. TEL. CO. (GILMAN v.). See Case No. 5,443.

ILLINOIS & ST. L. BRIDGE CO. (MORGAN v.). See Case No. 9,802.

---

## Case No. 7,007.

### ILLINOIS & ST. LOUIS RAILROAD & CANAL CO. v. ST. LOUIS et al.

[2 Dill. 70;[1] 5 Chi. Leg. News, 49; 4 Leg. Gaz. 355.]

Circuit Court, E. D. Missouri. Sept., 1872.

PROPERTY DEDICATED FOR PUBLIC WHARF—USES —MUNICIPAL CONTROL OVER—GRAIN ELEVATORS THEREON—BY WHOM AUTHORIZED — MUNICIPAL CONTRACTS — PUBLIC MUNICIPAL POWERS CANNOT BE SURRENDERED OR ABRIDGED.

1. A municipal corporation may, unless specially restricted, make an irrevocable dedication of property to the public for the use of a public wharf.

[Cited in Matthews v. Alexandria. 68 Mo. 119; City of Indianapolis v. Indianapolis Gaslight & Coke Co., 66 Ind. 408; Belcher Sugar Refining Co. v. St. Louis Grain Elevator Co., 101 Mo. 201, 13 S. W. 822; Citizens' Gas & Min. Co. v. Town of Elwood, 114 Ind. 334, 16 N. E. 624; Littler v. City of Lincoln, 106 Ill. 363.]

2. Where property within the limits of a municipal corporation and along the bank of a navigable river is dedicated to the public for the use of a wharf, and where the municipal authorities are invested with the regulation and control of the uses of the property thus dedicated, they may, unless specially restricted, authorize, under an ordinance not otherwise objectionable. the erection of a grain elevator thereon to facilitate the handling of grain at the wharf.

[Cited in Barney v. Keokuk, Case No. 1,032.]

3. The uses to which property dedicated or acquired for a public wharf may be put, discussed.

4. An ordinance by which the municipal authorities undertake, without express legislative authority therefor, to surrender to a private corporation or person their control over the public wharf for a fixed period, as, for example, an ordinance giving to private persons the right to occupy a portion of the public wharf with a

grain elevator for fifty years without reserving the right to resume possession and regulate charges, is void.

[Cited in Belcher Sugar Refining Co. v. St. Louis Grain Elevator Co., 82 Mo. 127; Wiggins Ferry Co. v. East St. Louis U. Ry. Co., 107 Ill. 452.]

5. It is only in virtue of special and individual injuries that private persons can apply for relief in equity against public nuisances; and to justify such relief, it must appear that the remedy at law is inadequate.

[Cited in Julia Building Ass'n v. Bell Telephone Co., 88 Mo. 261.]

6. This principle applied, and the plaintiffs held not entitled to an injunction against the erection of a grain elevator on the public wharf at St. Louis.

This cause is, at present, before the court on the motion of the complainant for the allowance of a temporary injunction, to prevent the erection by the elevator company, under an ordinance of the city of St. Louis, of a grain and package elevator upon a portion of the public wharf of the city. The complainant is a corporation created by the state of Illinois for the purpose of mining and selling coal, with authority to construct and operate a railroad from its mines to a point in that state opposite St. Louis; and with authority, also, to establish and maintain a ferry from its lands in Illinois to the city of St. Louis, for the transportation from shore to shore of the products of its mines, and also of other property, and of teams and travelers. The bill sets out that the complainant is the owner of several duly licensed and enrolled boats and vessels of more than one hundred tons burden, propelled by steam, and which are used by it in transporting coal and other property, as well as persons, to the city of St. Louis, making for this purpose at least six round trips per day. The bill alleges the regular payment, by the complainant, and by the owners of other vessels, to the city, of wharfage fees or taxes, under the ordinance (No. 7,097) of January 14, 1870, establishing the "harbor department" of the city, and avers that the receipts by the city from this source have resulted in a surplus, after paying for the public wharf and its maintenance and repairs; and the complainant claims, that by reason of such payment, it is entitled to the use of the public wharf as a place at which to land its boats, and to load and unload the same. subject to reasonable municipal and police regulations. The bill avers, that since January, 1870, the complainant has been accustomed, by the direction and designation of the city authorities, to load and unload its boats at and upon a portion of the public wharf, which the city, by the ordinance presently to be mentioned, has undertaken to grant to the Pacific Elevator Company, for the erection of an elevator thereon; that it has paid the city therefor, as wharfage, at the rate of $300 for every term of six months, and that it has so paid up to the 1st day of July, 1872, the bill in the case having been filed

---

[1] [Reported by Hon. John F. Dillon. Circuit Judge, and here reprinted by permission.]

April 10, 1872. It is alleged that this portion of the wharf is the nearest, most natural, and convenient for the business of the complainant, as its road terminates nearly opposite thereto, on the Illinois shore; that no other portion of the wharf has been pointed out to the complainant for his use, and that the remainder of the wharf in and about the business portion of the city is already fully occupied by boats and vessels, and otherwise, and that by reason of the action of the city in the adoption of the ordinance in favor of the elevator company hereafter named, the complainant has been injured, and a cloud cast upon its right as a part of the public, to the use and enjoyment of the wharf. The bill then sets forth, in detail, the history of this wharf, with a view to show that the property was specially dedicated either by the proprietors, or by the city, or both, to be used, and used only, as a public wharf. The bill then avers that the Pacific Elevator Company is a private stock corporation, organized under the general incorporation laws of Missouri, for the purpose of erecting, maintaining, and operating within the city of St. Louis, in connection with railroads and river, or either, one or more elevators for the handling of grain and other produce; and that its business is intended to be largely, if not altogether, with the Pacific Railroad Company, and with manufacturers of flour in the city of St. Louis; and that its connection with boats and vessels is but secondary and incidental. The bill then sets forth the ordinance of the city, of February 6, 1872, numbered 7,925, which is as follows:—

"An ordinance authorizing the construction of a public grain and package elevator by the Pacific Elevator Company, and providing for the management of the same.

"Be it Ordained by the City Council of the City of St. Louis:—

"Section 1. For the purpose of better facilitating the loading and unloading of grain and other articles of merchandise landed on the public wharf of the city of St. Louis, the Pacific Elevator Company, upon the conditions and subject to the regulations hereinafter set forth, are hereby authorized to erect, and for the full period of fifty years from the date of the acceptance by them of this ordinance, to maintain a grain and package elevator and appurtenances, with the necessary appurtenances and surroundings thereto, upon that portion of the public wharf of said city included within the following boundaries and description, to-wit: Beginning at a point where the north line of Chouteau avenue produced intersects the east line of the wharf, thence on said line running westward one hundred and fifty feet, thence northward six hundred feet, on a line parallel with the east line of the wharf, and thence eastward one hundred and fifty feet, to the east line of the wharf, and thence southward along said east line

of the wharf six hundred feet, to the place of beginning.

"Sec. 2. The elevator hereby authorized shall be erected upon pillars or piers of iron or stone, built to a height sufficient to bring the lower floor of said elevator for eighty feet from the east front as high as on a level with the surface of the wharf at the west line of that portion of said wharf described in the first section of this ordinance; and said piers or pillars shall be placed in regular order not less than twenty feet apart, parallel with the east line of the wharf, so as to afford at all times a free water and passageway under the said elevator, except so far as the same may be obstructed by the before-mentioned piers or pillars. The work of constructing said elevator and appurtenance shall be commenced within six months of the approval of this ordinance, and shall be prosecuted with all practicable speed to completion, at a cost of not less than two hundred thousand dollars, and said elevator shall fairly represent that sum in character and capacity, and shall be fully completed within two years from the approval of this ordinance; and in case the said Pacific Elevator Company shall neglect or fail to commence the work of constructing the same within six months from the approval of this ordinance, or having so commenced said work shall neglect or fail to complete the same in the manner prescribed within said two years from the date of the approval of this ordinance, then, and in either cases all privileges granted under this ordinance shall wholly cease. The city engineer shall exercise a general supervision over the construction of said elevator, appurtenances and approaches, so far as may be necessary to protect the interest of the city, and the plan of the elevator and approaches shall be submitted to, and be approved by, him before any work shall be commenced in constructing the same; and it is especially understood that the city of St. Louis does not part with or grant away its right to regulate and control any part of the wharf and river front occupied or used by said Pacific Eevator Company, and said company shall be subject to such general rules and regulations as the city of St. Louis may prescribe from time to time.

"Sec. 3. The elevator hereby authorized shall be used only as a public grain, produce and package elevator, for the storage, loading, and unloading of all grain and merchandise, which shall be tendered, without discrimination, subject only to such reasonable regulations, requirements, and just charges and compensation as said company may deem necessary, not in conflict with the ordinances of the city. Said Pacific Elevator Company shall keep that portion of the wharf described in the first section of this ordinance, as, also, twenty-five feet on the northern and southern sides thereof, at all times clean and in good order and repair, at

their own proper cost and expense; and shall remove all sediments deposited both north and south of the above-mentioned lines and boundaries that may have been caused by the erection and maintenance of said elevator on the wharf; and shall, for and during said full term and period of fifty years, render and pay to the city of St. Louis an annual wharfage tax of six hundred dollars, payable semi-annually, on the first day of April and the first day of October of each year.

"Sec. 4. In case the privileges and requirements of this ordinance are accepted by the said Pacific Elevator Company, the said company shall file a written statement of such acceptance with the city register within twenty days from the approval of this ordinance; otherwise they shall be deemed and held to have declined such acceptance, and the privileges hereby granted shall cease; and upon the filing of such acceptance within said time the city register shall give said company a certificate that such acceptance has been so filed according to the requirements of this ordinance.

"Sec. 5. The city of St. Louis makes no guarantee in this ordinance of any privilege herein proposed to be extended, and shall in no way be held responsible or in danger for what may result from anything herein contained.

"Approved February 6, 1872."

It is alleged that the elevator company have taken actual possession of that portion of the wharf, have enclosed the same, and are preparing to erect within the space thus inclosed a large and permanent building under and in pursuance of the terms of the ordinance just mentioned, and which, it is charged, will be a public nuisance.

The prayer is that the ordinance in favor of the elevator company be declared null and void; that the obstructions already made on the wharf be declared nuisances, and ordered to be abated; that the defendants be restrained from further holding exclusive possession of the said portion of the wharf, and from erecting thereon any building or structure which shall not leave the wharf open at all times, to all persons, and for general relief.

A stipulation signed by the parties is filed, admitting that the complainant "by virtue of the facts alleged in the bill has up to the 1st day of July, 1872, such special interest as will authorize it to institute this suit, if in fact the elevator proposed to be erected under ordinance 7,594, would be a public nuisance." The stipulation also admits that "it is the intention of the Pacific Elevator Company to erect and carry on an elevator strictly in pursuance to the ordinance; and the questions submitted to the court are whether the said ordinance is valid; and whether, if the said elevator is erected and conducted strictly in pursuance of the said ordinance, it would be subject to be abated as a public nuisance." It is also stipulated "that the receipt and shipment of grain in bulk enters largely into the commerce and trade of St. Louis, which is constantly increasing both by river and rail, and that elevators are an economical and expeditious method of handling such grain, but were not in general use at the time the wharf was dedicated or opened."

John W. Noble, for complainant.

Geo. E. Leighton and Sharp & Broadhead, for defendants.

Before DILLON, Circuit Judge, and TREAT, District Judge.

DILLON, Circuit Judge. The ordinance of the city of St. Louis, adopted February 6, 1872, the validity of which presents the main question for consideration, in terms describes the place upon which the elevator building therein mentioned is to be erected as a "portion of the public wharf of the said city." It is material to understand with precision what is meant by the public wharf in St. Louis. The history of the acts of the city in respect to the wharf appears in the papers and documents on file. On March 1, 1851, the mayor was authorized by joint resolution to make arrangements to perfect the title of the city to the entire wharf, or to any portion thereof. On the next day (March 2) the city, by ordinance (No. 2,596), established the eastern and western lines of the wharf, from Plum street to the southern limits of the city—these lines being 265 feet apart; and subsequently the wharf was extended to the northern boundary line of the corporation.

In 1851, also, the owners in old blocks 43 and 44, claiming to be riparian proprietors, and to own what are now known as blocks 855 and 856 (in front of which the elevator is authorized by the ordinance of February 6, 1872, to be erected), executed an instrument by which, "in consideration of the benefit which will accrue to us and the sum of one dollar," they "authorized the city of St. Louis to locate and construct on any lands claimed by us, a wharf two hundred and sixty-five feet wide, as established by the ordinance of the city (No. 2,596, supra)." The instrument then proceeds: "And we do hereby dedicate and appropriate the said lands so taken to the use of a public wharf, to hold the same as established in said ordinance No. 2,596, for the use of a wharf, to be under the entire control and management of said city; said wharf to be constructed, repaired, taxed, and wharfage therefrom applied as the city may deem expedient."

The city also claims title or right to the wharf property by quit claim from the public schools, which was expressed to be for the wharf as established, and also under an act of the legislature in 1864–5, and also under an act of congress of June 12, 1866, granting to the city all the interest of the

United States in and to all wharves, etc., within the limits of the city corporation. It is not material in this case to determine what rights to the wharf property came from the one source or the other. So far as the right comes through the instrument made in 1851 by the proprietors of blocks 43 and 44 or 855 and 856 (see Board, etc., Public Schools v. Risley, 40 Mo. 356; Schools of St. Louis v. Risley, 10 Wall. [77 U. S.] 91), the dedication is expressly for a public wharf. If the city in any way ever owned the fee to what is termed the wharf, the ordinances produced to the court satisfactorily show an irrevocable dedication thereof by it to the use of the public as a wharf. A city corporation, like any other proprietor, may, unless specially restricted, make such a dedication; and when the rights of the public have attached the dedication cannot be recalled. Dill. Mun. Corp. § 498, and cases cited. After what the city has done with respect to the wharf property, no court would allow the corporate authorities to regard it as private and sell or otherwise dispose of it as such.

The counsel on both sides have treated the property as having been dedicated to public use as a wharf, and the authority over it to be such as exists in the city by virtue of its powers under its charter, and not in virtue of any ownership of it, present or past. We shall accordingly assume the wharf property upon which it is proposed to erect the elevator to be property which, either by the former proprietors or by the city, or both, has been effectually dedicated to the public for a wharf, and that the public may make every use of it, under the control and regulation of the city authorities, or of the legislature, which falls within, but no use which falls without, the scope and meaning of such a dedication.

The reference to the history of the wharf, so-called; its location on the bank of the river; its width and its length, extending along the whole water line of the city, embracing in the phrase not only the improved, but unimproved portions of the bank, will be seen to be material, when we come to consider the question as to the nature of the uses which it is allowable to make of property dedicated for such a purpose.

The legislature, in the charter of the city, has conferred upon the mayor and city council a great variety of powers, and, among others, the following: "8. To construct all needful improvements in the harbor; * * * to erect, repair, and regulate public wharves and docks; * * * to regulate the stationing, etc., of vessels within the city; to charge and collect wharfage," etc. After a detailed enumeration of the various legislative powers granted to the city, the charter proceeds: "17. Finally, to pass all such ordinances, not inconsistent with the provisions of this charter or the laws of the state, as may be expedient in maintaining the peace, good government, health, and welfare of the city, its trade, commerce, manufactures," etc. None of the other provisions of the charter, cited by counsel, seem to have any direct bearing upon the power of the city over the wharf property. It will be perceived, therefore, that there is no express legislative authority to the city to erect buildings, or to authorize the erection thereof, upon the property known as the public wharf.

And here the complainant takes the position which we shall now consider, that without direct legislative sanction (if, indeed, with it), it is not competent for the municipal authorities themselves to erect, or, under an otherwise unobjectionable ordinance, to authorize the erection of an elevator building upon the wharf, to be used for handling grain arriving at or to be shipped from it. The argument in support of this position is, that the property is dedicated to be used for a particular purpose, viz: for the purpose of a wharf, and that the occupation of it by a permanent structure of any kind, though its design, purpose, and effect may be to facilitate the receipt and transfer of grain or merchandise at the wharf, is an unauthorized use of the property. In other words, it is insisted that it is a perversion of the use for which the property was acquired or dedicated, to allow the erection thereon of an elevator to facilitate the receipt and shipment of grain in bulk at the wharf; and, consequently, that such a structure would, if built, be a public nuisance, and liable to be proceeded against and abated as such. This makes it essential to consider what are legitimate uses of property dedicated for a public wharf; and this must depend, in the absence of controlling legislative enactment, or of special limitations imposed by the dedicator, upon his presumed intention, to be gathered from the nature, situation, and location of the property, and the wants of the public. In 1851, when the city began to take steps to provide more adequate wharf accommodations. it was already possessed of an extensive trade and commerce, mainly carried on by the river. Wisely contemplating the future, it set apart a space along the whole water boundary, and termed it, whether improved or not, the public wharf. What was the purpose in setting apart property thus acquired and to be acquired for a wharf? Clearly, it was to make provision that rafts, boats, and vessels of all kinds could effect a landing in front of the city, and have a place upon which to discharge or from which to receive wares, merchandise, and cargoes of all descriptions. This was to be done upon the bank or margin of the river, which, whether improved or not, was compendiously styled the wharf—the public wharf. This is fully shown by the ordinances of the city in relation to this subject.

Both under the dedication referred to and

by its charter, the city is authorized to regulate the public wharf. Its right to appropriate different parts of the bank, called the wharf, to different uses of a proper character, admits of no doubt. It may set apart a portion exclusively for steamboats, and require them to land there, and not elsewhere. So it may require rafts, woodboats, coalboats, grainboats, etc., to land at specified and separate parts of the wharf; and such is shown by its ordinances to be the practice of the city in regulating the use of the bank of the river. The parties have stipulated that the receipt and shipment of grain in bulk enters largely into the commerce and trade of St. Louis, which is constantly increasing, both by river and rail, and that elevators, by means of the mechanical contrivances within them, afford an economical and expeditious method of handling grain arriving in this condition. Formerly grain was carried almost wholly in sacks, and was deposited on the wharf or levee preparatory to its transfer to vessels on the one hand, or to drays or other vehicles, on the other, and, in this shape, arriving in small quantities, it was easily protected from rains by means of tarpaulins, or in some similar manner. Can it be questioned, however, that the city authorities, if they had deemed it expedient, might not have erected, at various places, structures on the wharf to shelter grain in this condition? That they may not have found it necessary is no test of the measure of the right, and no evidence that every use of the wharf is illegitimate which contemplates the erection of a structure upon it. But now grain reaches St. Louis in bulk, and how shall it be handled? Must the owners incur the expense and delay of putting it into sacks or of transferring it by shovels into wagons, while the rest of the world freely make use of cheaper and improved modes of handling it?

A single elevator, occupying a small portion of the wharf, may be made to handle one hundred thousand bushels or more of grain per day, at a trifling cost per bushel, while the handling of the same amount in sacks or wagons would require a much larger space of the wharf, and be attended with delays and with increased expense, both to the owners and the public.

The dedication of the property was perpetual, and for the benefit of the public. The extent of the dedication, its scope, remains the same, but the mode of using property dedicated for a wharf may change from time to time as the wants of commerce or the public may require, and this the dedicator is presumed to contemplate when he makes the dedication.

What benefit is it to the dedicator to insist when grain reaches St. Louis in bulk that it shall be sacked or hauled away in vehicles? What right has the owner of a steamboat plying the river and not constructed with a view to carrying grain in bulk, to insist that the old methods shall be continued? If the city, under the powers conferred upon it before mentioned, should see fit to set apart a portion of the wharf for the landing of boats carrying grain in bulk, and to erect thereon artificial contrivances to facilitate the loading and unloading of such vessels, it has, in our judgment, the clear right to do so; and since grain in this condition requires to be effectually protected from the weather, proper structures to afford such protection may be erected by it on the wharf, the same as it might make any other improvement germane to the purposes of a wharf and within the scope of the dedication.

A wharf differs in many material respects from a street. The latter is primarily intended for the purposes of passage or travel, and any erection in it, without legislative authority, is a nuisance; but a wharf is intended to afford convenience for the landing of vessels, the loading or unloading of their cargoes, and to supply a place on which the wares discharged from vessels or awaiting shipment may be laid or deposited; and it would seem that structures or appliances of any kind intended, and which have the effect to facilitate the handling and preservation of merchandise arriving at the wharf, erected upon it under municipal authority, and remaining at all times subject to municipal control, would be lawful and within the purposes for which the wharf property was acquired or dedicated.

We do not say that the municipal authorities could use the wharf property for mere warehouse purposes, though we have no doubt that it would be competent for them to erect, or authorize the erection thereon, of such structures for the receipt and shipment of goods by water, as they might deem expedient in order to promote the trade and commerce of the city.

And we are clearly of opinion that the erection, under the sanction of the city, of an elevator to be used in handling grain at the wharf, and at all times under the direction and control of the municipal authorities, is such a use of wharf property as does not fall without the scope of dedication, and such a structure would not, therefore, be a public nuisance.

We have not met, nor have the counsel cited, any adjudications upon the precise point; and we have, therefore, been compelled to decide it upon principle, and have felt that it was due to the importance of the question to set forth our views, as we have done, with considerable fullness.

The next question is, whether the ordinance of February 6, 1872, authorizing the elevator company to erect, maintain, and carry on the elevator upon the wharf, is valid. One effect of this ordinance, if valid, is, in my opinion, to set apart and surrender to the exclusive use of the elevator company, for the full period therein named, one hundred and fifty by six hundred feet of the pub-

lic wharf. This ordinance, when accepted by the company, as it is alleged it has been, constitutes a contract between it and the city; and if it be a valid contract, and shall be complied with by the company on its part, it must continue in force and be binding upon the city for the next fifty years. Whatever may be the changes in the condition and wants of the city, or of the public, within that period, the hands of the municipal authorities are effectually tied by this contract, and the elevator company has the right to maintain the structure and to retain possession of this portion of the public wharf. If it should become, in the judgment of the mayor and city council, positively detrimental to the welfare, trade and commerce of the city, or if the space it occupies should, in their opinion, be more urgently needed for other purposes, still this structure must remain.

The ordinance, if valid, places the property occupied by the elevator beyond the control of the city authorities. Nay, more: if it is a contract (as it is, if valid), it possesses all the legal attributes of a contract, is within the protection of the national constitution, and the elevator company may not only hold possession of this portion of the wharf, and carry on its business there against the will of the city corporation, but equally against the will of the legislature, which is the supreme guardian of the public rights in all public places.

In the light of these grave consequences, we shall inquire presently, whether the corporation of St. Louis has been clothed by the legislature with the power, not only to disable itself, but also to disable the legislature, except by the exercise of the eminent domain, for half a century from full and unrestrained control over the public wharf and its uses.

Another effect of this ordinance, in my opinion, if valid, is, that the city has no control over the charges which the elevator company may make for its services in handling and storing grain and other property. Counsel argue that the power was expressly reserved by the city; but on careful consideration of the provisions of the ordinance, my judgment is otherwise. The language of the ordinance in this respect is this: "It is especially understood that the city of St. Louis does not part with or grant away its right to regulate and control any part of the wharf and river front occupied or used by said Pacific Elevator Company, and said company shall be subject to such general rules and regulations as the city of St. Louis may prescribe from time to time. The elevator hereby authorized shall be used only as a public grain, package, and produce elevator, for the storage, loading and unloading of all grain and merchandise which shall be tendered without discrimination, subject only to such reasonable regulations, requirements, and just charges and compensation as the said

company may deem necessary, not in conflict with the ordinances of the city."

Without any reservation whatever, the legislative and police power of the city over this structure, except so far as controlled by the contract, would remain. The language that the city does not part with its right to regulate and control the portion of the wharf used by the elevator company, can be true only in a qualified sense; for, as above shown, it has parted, on the assumption that the ordinance is valid, with its right to control the use of it for fifty years. The special reservation is, that the company shall be subject to such general rules and regulations as may be prescribed by the city—not special rules and regulations for this particular elevator, even if the general language "rules and regulations" would embrace the right to fix tariffs and prices.

Assuming that the use of the wharf for an elevator is a legitimate use, and this ordinance granting the right to the elevator company thus to use it, is valid, I cannot find any provision of the ordinance which fairly admits of the construction that the company has parted with its right to fix its own prices and agreed to abide by those fixed by the city, or by which the power of the city over the prices to be charged by this elevator company is any greater than over the prices to be charged by others. In the absence of a concession of the right, the elevator company would, of course, have the unqualified power, as against the city, to prescribe its own prices. If it be claimed that it has surrendered this right, the onus lies on the party advancing the claim to establish it. The point is one of great consequence, and how easy and how natural it would have been, if such had been the intention of the parties, to have said, in terms the city may regulate prices.

This conclusion finds some support, also, in the fact that the company pays the city an annual compensation for the use of the property; and in the further consideration that it is not to be presumed, nor upon doubtful grounds held, that the company have agreed to expend at least $200,000, and have the value of that investment depend upon the uncontrolled action of the city authorities.

I attach less importance, however, to this point, because, if mistaken in respect to it, my opinion would still be, that the ordinance is invalid, on the ground first suggested, viz: that the city cannot, under the powers given in its charter before mentioned, thus surrender the control over the use of the wharf property.

The only powers delegated to the city by the legislature in respect to wharves have been before mentioned, and they are, in substance, to erect, repair, and regulate them, and to pass ordinances to promote the welfare, commerce, and trade of the city. These are public or legislative powers, in-

capable in their nature of delegation or of surrender by the municipality. It is too plain for argument, that under these general powers, the city could not sell or alien any portion of the wharf property, whether acquired by dedication or condemnation. It is equally plain, that they do not authorize it to make a lease of the property to private individuals for a fixed period incapable of determination by the city at its will. If the city may, by a binding contract, surrender its control over six hundred feet of the wharf property, it may, on the same principle, equally surrender its control over six thousand feet. If it may surrender its control for fifty years, it may equally for ten times fifty years, and what is the practical difference between that and an absolute alienation?

It is to be borne in mind that the supreme or ultimate control over the uses of public places is in the legislature, and that the only powers in this respect possessed by the city are derivative and rest upon legislative grant. The only grant is of the power to regulate the wharf, and this falls far short of conferring upon the city the power to surrender for a fixed period its exclusive use to private persons or corporations. Such authority must rest in a plain grant from the legislature.

These principles are not new. On the contrary, it has been decided time and time again that powers conferred upon municipal corporations for public purposes cannot be either delegated to others, or surrendered, or renounced. Such corporations may adopt by-laws or make authorized contracts, but they have no power as a party to enter into contracts or pass ordinances which shall cede away, control, or embarrass their legislative or governmental powers, or which shall disable them from performing at all times their public duties. The reports are full of cases establishing this salutary doctrine; and, for the protection of the public, it is of the first importance that it shall be maintained by the courts in undiminished efficiency. See cases cited in Dill. Mun. Corp. § 61; Id. §§ 542, 567.

One instance will suffice to illustrate the principle. The city of New York possessed by its charter the general power to open, alter, repair, and regulate streets. Under this power, without any express authority from the legislature, the corporation of the city undertook to confer by resolution upon an association of persons the exclusive right to construct and maintain for a term of years, a street railway in Broadway. The judgment of the court was against the validity of the resolution, and rested upon the sound principle that the powers of the corporation in respect to the control of its streets cannot be surrendered or delegated by contract to private parties; and hence the resolution of the council authorizing private persons to construct and operate a railroad upon certain terms, without power of revocation and without limit as to time, was not a license or act of legislation, but a contract; void, however, because if valid it would deprive the corporation of the control and regulation of its streets. "Taking the whole ordinance together," says Comstock, J., in his opinion, "it is no less than an abrogation by the common council of their powers and duties over and concerning the public streets, and a surrender of a considerable portion of those powers and duties into the hands of private individuals, or a private corporation. This the corporation of New York cannot do. Time and experience may give a very unfavorable solution to the question whether this railroad or any railroad in Broadway, can be beneficial to the public, but the hands of the city government will be tied by the contract into which it has entered, and future change and improvement may be prevented by the voluntary surrender—in effect in perpetuity—of its own powers. On this ground the ordinance is void." Davis v. Mayor, etc., of New York, 14 N. Y. 506, 532.

This view was subsequently approved by the same court: Milhau v. Sharp, 27 N. Y. 611. And the same principle is asserted in Goszler v. Georgetown, 6 Wheat. [19 U. S.] 593, 597, where, in the language of Chief Justice Marshall. it is held that a municipal "corporation cannot abridge its own legislative power."

The doctrine is unquestionably sound, and it is decisive against the validity of the ordinance under consideration. It is scarcely necessary to observe that an attempt to surrender the control over a street or public wharf for fifty years is just as objectionable in principle as where the surrender is without limit as to time. The principle is, indeed, the same.

My Brother TREAT concurs in the principles of law which have just been stated. but he differs with me on the question of the validity of the ordinance. In his judgment. applying to the ordinance the well known principle that public grants are to be construed strictly against the grantees and liberally for the public, he thinks that by the proper construction of the powers reserved in the ordinance to the city authorities they have the right at any time, if necessary for wharf purposes, both to resume possession of the portion of the wharf on which the elevator may be built, and to regulate the charges which the elevator company may make for their services. In this view of the reserved powers of the city under the ordinance I can not concur. I am clearly of the opinion that if the elevator company complies with the ordinance, it was the intention to give it a right "to maintain" the elevator "for the full period of fifty years," and I strongly incline to the opinion that the regulation of tariffs is also beyond municipal control.

We agree in opinion, however, that under the charter as it stands, it is essential to the validity of the ordinance that the municipal authorities shall at all times have the right to resume possession of the ground occupied by the elevator, and to control and regulate the prices which may be charged thereat, and that these powers, certainly without plain legislative authority to that effect, can not be surrendered or bargained away for any fixed or definite period. The only point of difference is, whether under the ordinance in question the city has reserved the right at any time during the fifty years, to regain possession of the property, and at all times to regulate the compensation and charges of the elevator company; if it has we would concur in the opinion that the ordinance is valid, and if it has not, that it is void.

The next and only remaining question is whether, if the foregoing views be sound, the plaintiffs are entitled to an injunction to restrain the erection of the elevator. They ask it on the ground that if erected it will be a public nuisance, because the structure can derive no legal sanction from a void ordinance.

We need not inquire what right the state would have to abate an elevator or other structure erected on the wharf without legal authority, for the state or its officers are not parties to the present bill. Equity, it is well known, will enjoin or relieve against a public nuisance where there is imminent danger of irreparable mischief before there can be an effectual remedy at law, when its jurisdiction is invoked in behalf of the state or the public. But in order to justify equitable interference in behalf of private parties, it must appear that they are in danger of suffering individual and special injuries beyond those suffered by the public at large, and of a nature for which the remedy of a private action for damages would be inadequate.

It is only in virtue of special and individual injuries that private persons can ask for equitable relief. Mississippi & M. R. R. Co. v. Ward, 2 Black [67 U. S.] 485; Georgetown v. Canal Co., 12 Pet. [37 U. S.] 91; Wheeling Bridge Case, 13 How. [54 U. S.] 518; Spooner v. McConnell [Case No. 13,-245.]

Upon these principles, it is plain, admitting the substantial averments of the bill to be true, that no case is made out by the plaintiffs for an injunction to restrain the violation of their individual or private rights. It is not shown that they have now any right to land or to insist upon landing, at, or to use that portion of the wharf, on which it is proposed to erect the elevator. On the contrary, it is manifest that they have no such right; but that it is competent for the city authorities to require them to land their boats elsewhere, and to prohibit landing them at the place where the elevator is to be built, unless laden with, or designed to carry, articles or merchandise for which that portion of the wharf is set apart.

There is no claim that the city authorities have sought to deprive the plaintiffs of the right to land at or do business upon the wharf; and to justify an injunction in their behalf, it should appear that they have a right to land upon this particular portion of the wharf where the elevator is to be built, or that its erection there will, in some other way, be specially injurious to them, and so injurious as to require relief in equity. No such case is shown. And it would seem difficult to make such a case when it is clearly within the lawful power of the municipal authorities to prescribe where the plaintiffs and all other persons shall land, and how and under what regulations, reasonable in their character, they are entitled to use the wharf.

We concur in holding that the motion for a preliminary injunction in the plaintiffs' behalf to restrain the erection of the elevator must be denied. Injunction denied.

NOTE.—This decision was acquiesced in by the parties. That the legislative powers and public trusts conferred upon municipal corporations cannot, without express or plain authority from the legislature, be bargained away, or surrendered, or abridged, either by contract or ordinances, is a doctrine which has been often decided and is settled law. Such corporations must at all times retain the full possession of their legislative powers, so as at all times to be able to discharge their public duties. An interesting recent illustration of this doctrine in a case analogous in principle to the one decided above, will be found in Gale v. Kalamazoo (1871) 23 Mich. 344, relating to a municipal contract respecting a market house for the city. See, also, People's Railroad v. Memphis Railroad (1869) 10 Wall. [77 U. S.] 38, 50; Louisville City Railroad Co. v. Louisville (1871) 8 Bush (Ky.) 415; Brooklyn v. Brooklyn City R. Co. (1872) 47 N. Y. 475; Milhau v. Sharp (1863) 27 N. Y. 611; Presbyterian Church v. Mayor, etc., of N. Y. (1826) 5 Cow. 538, followed; Stuyvesant v. Mayor, etc., of New York, 7 Cow. 588; Western Saving Fund Soc. v. City of Philadelphia, 31 Pa. St. 175; Ex parte Mayor, etc., of Albany, 23 Wend. 277; New York & H. R. Co. v. Mayor, etc., 1 Hilt. 562, 568; Martin v. Mayor, etc. (1841) 1 Hill, 545; Goszler v. Georgetown, 6 Wheat. [19 U. S.] 593; Sedg. Const. & St. Law. 634; State v. Graves (1862) 19 Md. 351, 373; Branson v. City of Philadelphia, 47 Pa. St. 329; Cooley, Const. Lim. 206; In re Albany St., 6 Abb. Pr. 273; Dingman v. People, 51 Ill. 277; Brimmer v. Boston (1869) 102 Mass. 19; Johnson v. Philadelphia, 60 Pa. St. 445; State v. Cincinnati Gaslight & Coke Co., 18 Ohio St. 262, 295; Mayor, etc., of City of Jackson v. Bowman (1861) 39 Miss. 671; Oakland v. Carpentier (1859) 13 Cal. 540, opinion of Baldwin, J.; Smith v. Morse, 2 Cal. 524. Compare Attorney General v. Mayor, etc., of New York, 3 Duer, 119, 131, 147; Davis v. Mayor, etc., 14 N. Y. 506, 532; Costar v. Brush, 25 Wend. 628.

---

ILLINOIS CENT. R. CO. (BARRON v.).
See Cases Nos. 1,052 and 1,053.