## STEWART *v.* ST. LOUIS, FT. S. & W. R. Co.

(*Circuit Court, D. Kansas.* February 26, 1887.)[1]

**1. CORPORATIONS—SALES BY DIRECTORS TO CORPORATION.**
T. and A., having, for a small sum, purchased a road-bed, the construction of which cost only $2,000, caused a railroad company to be organized, and, with others, became directors thereof, and while in this relation contracted with the directors to sell the road-bed to the company for $200,000 cash or bonds, and $3,600,000 of the capital stock. The sale was formally ratified at a meeting of the directors, and entered on the records of the company; and afterwards the stockholders unanimously approved the purchase. At the time of the sale there were no stockholders, and the stock thus issued was all that had been subscribed. The company had no property except its charter and the road-bed, and the value of the notes and stock issued to T. and A. had no marketable value. *Held*, that the sale was not fraudulent.

**2. SAME—COMPENSATION OF OFFICERS.**
Where it is understood by the directors of a corporation that its officers are to be paid for their services, though no salary is fixed a note given at the end of the year for a reasonable sum then agreed upon is valid.

[1]Publication delayed by failure to receive copy.

At Law.

*E. N. Hulett* and *J. D. McCleverty*, for plaintiff.

*A. A. Harris* and *J. H. Sallee*, for defendant.

FOSTER, J.   The plaintiff brings his action to recover on several promissory notes issued by the defendant company, amounting in the aggregate to $85,000.   The defendant, by its answer, denies that A. M. Ayers as president, and Ira D. Bronson as secretary, of said company, had authority to execute or issue said notes; that said notes were fraudulently and wrongfully issued through the collusion of the officers and directors of the company, and without any consideration whatever therefor.   The facts, in brief, are as follows:   In January, 1880, one M. S. Carter, of St. Louis, was the owner of a railroad bed graded and constructed westward from Ft. Scott to Humboldt by a company known as the "Ft. Scott, Humboldt & Western Railroad Company," being a distance of 40 miles.   On the 17th of February, 1880, Francis Tierman and A. M. Ayers entered into a contract with said Carter for the purchase of said road-bed, in their own names, for the sum of $15,000, and afterwards, in May, sold a third interest in the same to John J. Franklin.   In January preceding, said Tierman, Ayers, Bronson, and others associated with them, had become the promoters of the defendant railroad company, and had taken the necessary steps to incorporate said company, said Tierman and Ayers having signed and acknowledged the articles of incorporation on January 20th.   Bronson and Hill acknowledged said articles on February 21st, and the other five incorporators signed and acknowledged the same at different times from January 19th to February 21st; and on the 23d day of February, 1880, the charter was filed with the secretary of state, and the company became duly organized.   Its purpose was to build and operate a railroad from the eastern line of the state, near Ft. Scott, in a westerly direction, through the counties of Bourbon, Allen, Woodson, Greenwood, Butler, and Sedgwick, to Kingman, in Kingman county.   There were nine directors named for the first year, among whom were A. M. Ayers, F. Tierman, H. M. Ayers, Ira D. Bronson, J. D. Hill, and others.   At the first meeting, held February 28th, Francis Tierman was elected president, A. M. Ayers, vice-president, and J. D. Bronson, secretary.   In May following, said Tierman and A. M. Ayers entered into an agreement with the directors of said railroad company to sell to said company said road-bed at the sum of $200,000 cash or bonds, and $3,600,000 of the capital stock of the company.   This sale and the terms thereof were afterwards, in November, at a meeting of the directors, formally ratified and approved, and appear in full on the records of the company.   The purchase was afterwards approved, (March 4, 1881,) at a meeting of the stockholders, by unanimous vote; and a deed of conveyance was afterwards made and delivered by said parties to said defendant for said road-bed.   At the time of the sale there were no stockholders, and the $3,600,000 stock issued under the said purchase was all that had been subscribed or issued; and the only assets of the company were its charter and this road-bed.   The

said stock was issued, and the company, having no money or bonds, finally issued its notes for the $200,000, of which $120,000 have been paid; and this suit is brought on the remaining $80,000, together with a $5,000 note issued to J. D. Hill for a year's salary as superintendent. It appears from the evidence that the road-bed originally cost about $2,000. It had no marketable value, only as it could be used for the purpose for which it was made. It also appears from the evidence that the stock and notes of the railroad company, at the time they were issued, had no present marketable value. The value of the property sold, as well as consideration paid, (stock and notes,) depended very largely upon the success of the enterprise. There is no doubt but the directors Tierman, Ayers, and perhaps Bronson, while directors of the company, used their influence to consummate this sale from themselves as individuals to the company; and it is altogether probable they had that object in view when they bought the road-bed of Carter. But the question still remains, were they guilty of fraud, deception, or any other breach of good faith in their fiduciary relations as directors? At the time they bought the property the defendant company had not been organized; and at that time, of course, they could not have held any fiduciary relations to stockholders or any one else. When the sale to the company was made, they did hold a position of trust, and were bound, in their official action, to faithfully and honestly execute their duties, and not to make a deal where their personal interest should be served at the expense of the company they represented. *Wardell* v. *Railroad Co.*, 103 U. S. 651; *Ryan* v. *Railroad Co.*, 21 Kan. 365; *Koehler* v. *Iron Co.*, 2 Black, 715; 1 Mor. Priv. Corp. § 517; *Michoud* v. *Girod*, 4 How. 513. But it does not follow that the directors are prohibited, under all circumstances, from dealing with a member or members of the board as individuals. But there must have been a fair, open deal. It must have been free from fraud or collusion, and characterized by entire good faith. *Hotel Co.* v. *Wade*, 97 U. S. 13; 1 Mor. Priv. Corp. §§ 292, 521, 545; *Van Cott* v. *Van Brunt*, 82 N. Y. 535; *Simons* v. *Oil Co.*, 61 Pa. St. 202; *Oil Co.* v. *Densmore*, 64 Pa. St. 43; *Rice's Appeal*, 79 Pa. St. 168; *Parker* v. *Nickerson*, 137 Mass. 487. It does not appear in this case that there was any deception or fraud practiced by the parties. The property was open to inspection, and the approximate cost of constructing it was easily obtainable. Its value to the company for the purpose desired was not difficult to ascertain. I find no evidence of any representations as to its value or cost or purchase price made by the parties selling; but there is record evidence that the board of directors, several months after the sale, and with full knowledge of the transaction, formally approved and ratified it, and not only that, but subsequently, at a meeting of all the stockholders, the transaction was again ratified. Now, who was defrauded or deceived? All parties—directors and stockholders—assented to it; and, surely, subsequent purchasers of stock, or the corporation itself, cannot now object to it. 1 Mor. Priv. Corp. 290. It is true the vendors got a very large advance on the price they paid, but that is not alone the test by which the *bona fides* of the transaction is to be tried.

Id. 293. To them as individuals the property was of little or no value. To the railroad company, it could be made worth the price paid for it; and the vendors bent every energy to make the property useful to the company, and to make the enterprise successful, for their chances of getting money or any other value for the property depended very largely on the result. As before remarked, parties taking stock afterwards in the company cannot complain of the purchase. The records of the company showed the transaction. It was not kept a secret. There was no law compelling any person or municipality to take stock in the company unless they voluntarily chose to do so; and if they were deceived by misrepresentations of the officers, their cause of action rests on that deception, and not on an attack on the original contract of purchase.

As to the $5,000 note, it must be said that it was a fair compensation for the year's service of J. D. Hill as superintendent of the company. But his salary had not been fixed until the end of the year, and for that reason the defendant disputes its legality. It appears from the testimony that it was understood by the directors that the officers were to be paid for their services, and this sum was afterwards agreed on, and was reasonable. I know of no law to prevent its recovery. *Bank* v. *Drake*, 29 Kan. 311, 330, and cases cited. It is further urged by defendant that the execution of these notes was in violation of the fifteenth and other by-laws of the company. This by-law prohibits the giving of notes, bonds, bills, acceptances, etc., by the company, unless ordered by the board of directors. A few words will dispose of this objection. The note to Hill of March 10, 1882, was made by positive order of the board of directors, and by the president and secretary, as therein directed. Some by-law of the company required notes to be made to the order of the president and secretary. This is a mere matter of form, and not material. The other notes were made August 15, 1881, and the by-laws were not adopted until the 20th of that month; and, besides, the board of directors, at their meeting in November, 1880, directed that orders be drawn on the company for this $200,000. Orders are not notes; but that order of the board would, doubtless, have been good for acceptances, which stand on the same footing as notes under by-laws.

This transaction, so far as the main question is concerned, is a very common and usual one in the mining and oil interests of the country. A person becomes, by purchase or discovery, the owner of a mine or oil-well. He proceeds to form a joint-stock company to develop and work it. He puts his property in at a price largely in excess of what it cost him, and takes money or stocks, or both, in payment. Where no fraud or deception is practiced on any one concerned, but the whole matter is open and fair, it seems to me that the transaction is legal. Judgment must go for the plaintiff for the amount claimed.