PIETSCH and others, Respondents, vs. MILBRATH and others,
Appellants.

*October 24, 1904—January 31, 1905.*

*Corporations: Corporate stock: Fraud:* Res adjudicata: *Pleading:
Sufficiency of complaint: Findings: Judgments: Cause of action: Liability of promoters: Limitation of actions: Remedies:
Costs.*

1. Where on two former occasions the supreme court has held the
   circumstances alleged in a complaint constitute a good cause
   of action in favor of a corporation against the defendants, enforcible at the suit of plaintiffs as stockholders, to recover of
   the defendants the profits obtained in buying land at one price
   and selling it to the corporation at another, the sufficiency of
   the complaint to support a judgment is *res adjudicata.*
2. In such case, it appeared, among other things, from the language
   of the complaint and the language of the findings, supported
   by the evidence, that those against whom a judgment was rendered were parties to a plan to obtain control of certain real
   estate with a view of turning the same over to a corporation,
   to be formed, at a large profit to themselves without the stockholders therein, other than themselves, having knowledge of
   their obtaining such advantage; that the plan was executed
   by the forming of the defendant corporation and the conveyance
   of the land to it for about twice the sum the promoters paid
   for the same; that the promoters subscribed for nearly three
   fourths of the capital stock, ostensibly for cash to the corporation, but without such contribution made in fact; that the promoters sold the remaining stock for cash, the purchasers understanding that a like payment had been, or was to be, contributed to the corporate treasury for each share of the corporate stock; that these transactions took place at a time when
   only members of the combine interested in making such profits
   were members of the corporation, and that the plaintiffs furnished substantially all the capital of the corporation.   *Held,*
   that such facts supported the judgment.
3. Persons who act as promoters of a corporation do not necessarily cease to be such when the corporation is organized to
   do business.  They may retain their fiduciary relation thereto
   until its share of the capital shall have been taken and the
   corporation provided with a board of directors, or some reasonably efficient means of protecting itself.

4. If one or more persons acquire property, intending to promote the organization of a corporation to purchase it from them at a profit to themselves and effect such purpose, limiting the membership to interested parties until the transaction is completed between them and the corporation, intending thereafter to cause the balance of the capital stock to be sold to outsiders, they being kept in ignorance of the true nature of the transaction, and effecting such intent, the promoters are guilty of actionable fraud on the corporation and responsible to it for the gains made.

5. In such circumstances, in the making of the contract between the corporation and its agents, it is mere fiction as to its prospective members by original subscription.

6. In such case, since the corporation has no one to stand for it as an adverse party in the transaction, no meeting of adverse minds, essential to a binding contract, occurs.

7. In such case, the corporation is deceived, in that advantage is taken of its incapacity to protect itself, as to the interests of prospective memberships by the original taking of its stock.

8. Where promoters were concerned in a transaction of buying land at one price to turn it over to a corporation to be formed at a much greater price, and to induce others to come into the corporation in ignorance of the facts, such others contributing the actual capital necessary to fully accomplish the purpose of the promoters, the corporation, both before and after the adoption of the Code, had a remedy at law to enforce the liability of the promoters to refund to the corporation their profits.

9. In such case, when it appeared that the cause of action accrued more than six and less than ten years before the action was commenced, the cause of action of the corporation is extinguished, as is also that of the stockholders to enforce such cause of action.

10. Except in an action for relief on the ground of fraud in a case which was, on and before February 28, 1857, cognizable solely by a court of chancery (subd. 7, sec. 4222, Stats. 1898), the running of the statute of limitations is not postponed until the discovery, by the aggrieved party, of the facts constituting the fraud.

11. The maxim that there is no wrong without a remedy, does not apply to a wrong, so called, which is not a wrong at all, because the written law makes it otherwise.

12. The fact that the plaintiff has prosecuted his case in good faith, is no good reason for making an exception to the general practice of awarding costs to the defendant, where in equity the defendant prevails as to the entire cause of action set forth in the complaint.

APPEAL from a judgment of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Reversed.*

Action by stockholders of a corporation to enforce an alleged promoter's liability. The complaint was held sufficient in that regard upon two previous appeals. *Pietsch v. Krause,* 112 Wis. 418, 88 N. W. 223, and 116 Wis. 344, 93 N. W. 9. In the report of the first appeal a full statement thereof will be found.

The issues raised by the pleadings were decided substantially to this effect: Plaintiffs are members of defendant corporation, becoming such by taking stock therein on or about the time of its organization or purchasing stock thereafter. They commenced this action for its benefit. July 15, 1892, one *Thomas* and one Textor,—the latter being now deceased and represented in this action by *Clinton Textor,* administrator of his estate,—planned to obtain control of two certain farms, to cause a corporation to be organized to purchase the same from them at a price yielding them a large profit without the knowledge of such persons as they might induce to take stock in such corporation. July 15, 1892, pursuant thereto they secured the right to purchase one of said farms for $17,300, paying down a trifling sum, a few days thereafter assigning a quarter interest therein to defendants, *Mueller, Okershauser* and *Thomas,* who at that time were parties to the venture. July 21st thereafter *Thomas,* in further execution of such plan, secured the right to purchase the other farm for $46,584, paying down $1,000, and on the same day assigning a one-fourth interest in such right for a nominal consideration to his associates. August 10th, defendant *Charles W. Milbrath* on behalf of himself and defendants *Lindenmann, Kretschmar* and *Hanson* paid $2,000 on one of the purchase contracts, taking in consideration thereof *Thomas'* interest therein. Part, if not all, defendants prior to August 26, 1892, agreed upon the details of the corporation to be organized, the same being that the capital stock should

be 2,034 shares, of the par value of $203,400; that the mem-
bers of the combine should have 1,472 shares, ostensibly for
$34 per share cash, but really without consideration; that
562 shares should be sold to outside parties for $34 cash per
share; that the 1,472 shares should be distributed in propor-
tions specified, to the members of the combine, and that all
money contributed by them should be returned out of that
paid in by outsiders.   August 26th thereafter Textor con-
tracted to sell to one *Bird* ten shares of the prospective stock
for $340.   September 22d thereafter defendant *Krause* suc-
ceeded to the interest of Ramsey, refunding to the latter the
amount of his investment.   September 22, 1892, the articles
of organization of the contemplated corporation were duly
filed, the incorporators being said *Kretschmar, Milbrath,
Lindemann,* Textor and *Hanson.*   September 23d, in advance
of action by such corporation in respect to the matter, *Mil-
brath, Kretschmar, Lindemann,* Textor and *Thomas* caused
the title to the land by two deeds to be vested in Textor, the
stated consideration in each deed being "$1, and other good
and valuable considerations."   Said Textor thereupon con-
veyed the land to the corporation at a stated consideration of
$116,000.   The deeds were duly recorded.   When the title
was so vested in Textor, mortgages were given back for
$46,238.   When he deeded to the corporation, it, in form,
assumed and agreed to pay the mortgage indebtedness.   The
difference between such mortgage indebtedness and the cost
of the land to the promoters was paid by them and they were
thereafter reimbursed, in the main, pursuant to the aforesaid
plan, out of $6,630, paid for stock to the corporation by plaint-
iffs.   To aid in executing such plan a subscription paper was
prepared,—in form, obligating the signers to take the number
of shares in the corporation to be formed set opposite their re-
spective names at $34 cash per share.   The amount of the
proposed capital stock and the purpose of the corporation were
stated in such paper, in harmony with the foregoing.   The

promoters in the main, in order to disguise the real transaction signed the paper. Names of some of the plaintiffs were signed thereon, but whether by them or by their authority, does not clearly appear. At a meeting of subscribers to stock held October 4, 1892, no one being present but participants in the aforesaid profits, a board of directors was elected from their number. No record of the meeting was made for several months thereafter. October 6, 1892, a meeting of such board was held, no one being present but the said interested parties, when that which had theretofore been done as to acquiring the land was approved, and 562 shares of stock unsubscribed for was ordered set apart, to be known as "treasury stock" and sold at $34 cash per share, $2 per share to be allowed as a commission to persons placing the same. The result was that $1,050 was paid out of the corporate treasury as commissions. Many of the plaintiffs became purchasers of the so-called "treasury stock" and others bought stock that had theretofore been taken by some of the defendants, the former supposing themselves to be original takers thereof. In all cases they took the stock upon the faith of representations made to them that defendants had paid, or were to pay, the full sum of $116,000 for the land, and that all stock was taken on the basis of yielding $34 per share cash to the corporation. The total of 1,472 shares planned to be taken by the promoters, as aforesaid, was issued to them, but no stock was issued to any one prior to October 18, 1892. Each year, for several years after the organization of the corporation, for the purpose of keeping plaintiffs in ignorance of the facts aforesaid, misleading reports were sent to them by its officers as to its condition. They did not learn of facts rendering defendants liable for the profits made by them as aforesaid until a few months prior to the commencement of this action. The fair market value of the land sold to the corporation, at the time of the conveyance thereof, was $250 per acre. Further facts were found exonerating defendant Ramsey.

Upon such facts the court held, in effect, that the corporation was defrauded out of $34 per share on 1,472 shares of stock issued to the promoters, amounting to $50,048, and that defendants, except Ramsey, were liable therefor with interest. Judgment was accordingly ordered and rendered, requiring them to pay such sum and interest into court, or to the treasurer of the corporation upon a contingency named, for the benefit of the corporation, and judgment was also ordered and rendered against defendants, except Ramsey, for costs.

For the appellant *Krause* there was a brief by *Quarles, Spence & Quarles,* and oral argument by *T. W. Spence.*

For the other appellants there was a brief by *Julius E. Roehr,* attorney, and *Timlin & Glicksman,* of counsel, and a reply brief signed by *Timlin & Glicksman,* of counsel, and oral argument by *Mr. W. H. Timlin* and *Mr. Roehr.*

For the respondents there was a brief by *Geo. L. Williams* and *Bohmrich & Williams,* and oral argument by *Geo. L. Williams.*

The following opinion was filed November 15, 1904:

MARSHALL, J. As indicated in the statement, this court has twice held in this case that by rules in previous decisions made here the circumstances alleged to have occurred constitute a good cause of action in favor of the corporation against the defendants, enforcible at the suit of the plaintiffs as stockholders, to recover of the former the profits obtained in buying the land at one price and selling it to the corporation at another. The cases where the controlling principles have been proclaimed and applied are numerous, the most significant being *Pittsburg M. Co. v. Spooner,* 74 Wis. 307, 42 N. W. 259; *Fountain S. P. Co. v. Roberts,* 92 Wis. 345, 66 N. W. 399; *Franey v. Warner,* 96 Wis. 222; *Hebgen v. Koeffler,* 97 Wis. 313, 72 N. W. 745; *Milwaukee C. S. Co. v. Dexter,* 99 Wis. 214, 74 N. W. 967; *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125, 79 N. W. 229; *Spaulding v. North*

*Milwaukee T. S. Co.* 106 Wis. 481, 81 N. W. 1064; *Forest Land Co. v. Bjorkquist,* 110 Wis. 547, 86 N. W. 183.    It follows that the sufficiency of the complaint to support a judgment is *res judicata.    Case v. Hoffman,* 100 Wis. 314, 72 N. W. 390, 74 N. W. 220, 75 N. W. 945.

While, as counsel for appellants claim, the findings are indefinite, being so framed at some points that they might be taken one way or another, they follow the complaint in that regard.    Why this indefiniteness, we need not go far to discover.    A misunderstanding by counsel of language used in *Spaulding v. North Milwaukee T. S. Co. supra,* or inability of counsel to satisfactorily gather the purport thereof is very plainly portrayed in both complaint and findings.    It is probable the learned trial court allowed counsel to phrase the decision as it appears in the records, and if it were not for that which, though sanctioned by practice, in the judgment of the writer, cannot be too strongly condemned,—if the court had responded fully to the commands of the statute to state in writing its decision, instead of permitting the stating thereof to be done by one viewing the case from a one-sided standpoint,—the uncertainty complained of would not exist, and we would not have before us a decision as to facts, under any circumstances requiring careful consideration to determine its meaning in advance of pronouncing the legal effect thereof.

It is of course conceded that if the findings will reasonably admit of a construction harmonizing with and responding to the allegations of the complaint, as it was viewed here on the former occasion, on their face they will support the judgment. The view that we take of this case renders unnecessary any examination in detail of the numerous criticisms of the findings made by appellants' counsel, or deficiencies therein suggested.

It must be conceded that the following situation is well within the language of the complaint and the language of the findings, as well as supported by the evidence:   Those against

whom the judgment was rendered were parties to a plan to obtain control of certain real estate with a view of turning the same over to a corporation to be formed, at a large profit to themselves without the stockholders therein, other than themselves, having knowledge of their obtaining such advantage. The plan was executed by the formation of defendant corporation and conveyances of land to it for $116,000, when the expenditure to acquire such land was about one-half thereof, and taking 1,472 shares of the capital stock of the corporation, of the par value of $147,200, ostensibly at $34 per share, to be contributed in cash to the corporation, without such contribution being made in fact; the setting aside of 562 shares of stock to be sold by the corporation to outsiders at $34 per share cash, through the efforts of members of the combine, the purchasers understanding that a like sum had been, or was to be, contributed to the corporate treasury for each share of the corporate stock; the doing of all those things at a time when only members of the combine interested in making the profits aforesaid were members of the corporation; the completion of the plan thereafter by the sale of the 562 shares of stock at $34 per share, the plaintiffs being the victims and furnishing substantially all of the capital of the corporation. The legal effect of such facts, as we shall see, is sufficient to support the judgment, unless defendants are entitled to recover on their plea of the statute of limitations.

True, the complaint is so framed as to suggest that some, at least, of the plaintiffs were stockholders at the time the corporation was organized and the land conveyed to it, and were not then deceived as to the real nature of the transaction, true, the findings are so drawn as to suggest the same thing, and true, the evidence shows clearly that none of the plaintiffs were members of the corporation when the transaction occurred between it and the promoters whereby they obtained, substantially without consideration, 1,472 shares of its stock; that when the corporate proceedings were had respecting the

land every one then a member of the corporation was fully advised as to the nature thereof; that the only deception practiced on defendants was by inducing them to take the stock of the corporation at $34 cash per share, believing all the subscribers or takers of stock were to contribute likewise therefor; and if it be the law that if no one was literally, at the time the transaction between the promoters and the corporation occurred, deceived, then no complaint can be made by or in the name of the corporation against the defendants, no cause of action was established by the evidence unless that question is foreclosed by the decision made when the complaint was challenged on demurrer.

Counsel for appellants contend that the contingency above suggested as to the law is ruled in their favor by *Spaulding v. North Milwaukee T. S. Co.* 106 Wis. 481, 81 N. W. 1604;—that every member of the corporation, as matters stood when the land was transferred to it and the promoters came into possession of the profits sought to be regained, was fully advised in respect thereto; that no one was then deceived, so the prime essential of a cause of action in favor of the corporation is wanting; that if, after the consummation of the deal between the promoters and the corporation, deception was practiced by any defendant, inducing any plaintiff to take stock, supposing he was obtaining it on the same terms as the promoters, it is personal to himself. Those views are based on this language used in that case:

"The liability of promoters of a corporation is predicated on fraud, the essential element of which is deceit. It does not matter that the corporation received property at a higher price than it cost the promoter, to give the corporation a right to rescind or recover back profits made. It must have been deceived into paying such price or the corporation cannot be deceived, save as some of the individuals composing it are."

No serious fault can be found with that. Generally speaking, it is correct. It was used as regards a situation where all the stock of a corporation had been taken. Certainly the

court did not intend to hold that a corporation has not capacity to acquire a cause of action to recover profits made by its agents, acting in the double role of such agents and at the same time for themselves and to their own advantage, no one standing by to protect it; that they can perfect the corporate organization, keep control thereof for their own gain while ostensibly promoting its interests; that they can restrict subscriptions to stock to a part taken by themselves in order that their ulterior purpose may be accomplished; that while so in control for such purpose, ostensibly acting for the corporation but really for themselves, they may make the organization a mere secret conduit through which to convert the money paid by future subscribers to stock to their own gain and then use the corporate organization to aid in luring such subscribers into the trap, the corporation being powerless to prevent it— and yet the law furnish it no remedy for the wrong. To establish such a doctrine would be to open a most inviting avenue for the commission of fraud. Then the well-settled doctrine that promoters cannot secretly obtain profits from the corporation they cause to be organized and launched into the business world without being responsible to it therefor can be easily evaded by their organizing the corporation, taking part of the stock ostensibly at the full par value thereof in cash, but really paying little or nothing therefor, and then inducing others to take the balance of the stock in ignorance of the facts, paying the full par value therefor into the corporate treasury.

The law does not permit any such transaction as the one above suggested to go necessarily unredressed. Persons who act as promoters of a corporation do not necessarily cease to be such when the corporation is organized to do business. They may retain their fiduciary relation thereto till its share capital shall have been taken and the corporation provided with a board, or some reasonably efficient means of protecting its interests. So long as there are prospective original sub-

scribers for stock and the promoters and those concerting with them remain in control of the corporation, it is in a situation to be deceived, within the rule of the *Spaulding Case.* It is deceived in a legal sense when it is rendered helpless by its managers as to protecting those invited to subscribe for its stock, and is then used to aid in defrauding them. It is deceived thereby just as effectually as regards necessity for, and means of, redress as in a case where promoters by control of a corporation cause it to deal with them to their special advantage over then existing and unsuspecting members thereof.

The foregoing will be found well supported in authorities. If a corporation has been organized and persons promoting it up to that time continue to act for it by inducing persons to come in and subscribe for its capital stock, their relations as promoters continue.    Alger, Law of Promoters, § 20.    In the leading English case of *Erlanger v. New Sombrero P. Co.* L. R. 3 App. Cas. 1236, Lord CAIRNS said in substance:—

Promoters have in their hands the creation and molding of the company; they have power to define how and when and in what shape and under what supervision it shall start into existence and begin business. If they are doing all this in order that the company may, at the outset become, through its managing directors, a purchaser of property from themselves it is incumbent upon them to provide it with a board of directors, who will meet them at arm's length in arranging the business transaction.

The circumstances in that case were quite similar to those in this one.    There was an attempt to bind the corporation by a contract purporting to have been made between the vendor and directors before the shares were offered for subscription, whereas the directors were only the associates of the vendor, who exercised no judgment of their own in behalf of the corporation.

The rule stated by Lord CAIRNS is said not to apply when the promoters are subscribers of all of the capital stock (*Salo-*

*mon v. Salomon & Co.* 75 L. T. Rep. 437), or all the stock has been taken and the holders thereof assent to the transaction (*Parsons v. Hayes,* 14 Abb. N. C. 419). Then if a person acquiring stock otherwise than at first hands, is deceived into doing so by fraudulent representations that the full amount of the share capital has been paid into the corporation and that all the stock was taken on a common basis, his right of action for damages is personal, not for enforcement of the rights of the corporation. Morawetz, Corp. § 290. In harmony therewith is *Stewart v. St. L., Ft. S. & W. R. Co.* 41 Fed. 736, where it was held in effect that Lord Cairns' rule did not apply because at the time of the occurrence complained of the owners of all outstanding stock consented, the transaction was fully exposed on the corporation records, and it was not then intended to solicit further subscriptions to stock. There are other circumstances where Lord Cairns' rule has been said not to apply, but in no case has it been rejected in circumstances such as, or similar, to those where it was framed and declared.

From the foregoing we deduce this: If one or more persons acquire property, intending to promote the organization of a corporation to purchase it from them at a profit to themselves and effect such purpose, limiting the membership to interested parties till the transaction is completed between them and the corporation, intending thereafter to cause the balance of the capital stock to be sold to outsiders, they being kept in ignorance of the true nature of such transaction, and effecting such intent, they are guilty of actionable fraud upon the corporation and responsible to it for the gains made. In such circumstances, in the making of the contract between the corporation and its agents, it is mere fiction as to its prospective members by original subscription. Since it has no one to stand for it as an adverse party in the transaction no meeting of adverse minds, essential to a binding contract, occurs. The corporation is deceived, in that advantage is

taken of its incapacity to protect itself, as to the interests of prospective memberships by the original taking of its stock.

Applying the foregoing to the situation found to exist all who were concerned in the transaction of buying the land at one price to turn it over to the corporation to be formed at a much greater one, and to induce others to come into the corporation in ignorance of the facts, contributing the actual capital necessary to enable them to fully accomplish their purpose, became liable to refund their profits to the corporation, which liability was enforcible in this action, unless prior to its commencement it was extinguished by the six-year statute of limitations.

The action was commenced May 20, 1899, long after the expiration of six years from the time the cause of action in favor of the corporation accrued, unless the date thereof was postponed, as regards the remedy for the wrong, by subd. 7, sec. 4222, Stats. 1898. It is conceded that the life of the cause of action expired before such commencement, unless such subdivision applies. That provides that a cause of action for relief on the ground of fraud in a case which was on or before the 28th day of February, 1859, cognizable in a court of chancery shall not be deemed to have accrued until the discovery by the aggrieved parties of the perpetration of the fraud. Counsel for respondent argue that this action falls within that because the sole remedy afforded plaintiffs to enforce the right of the corporation was in equity and was so at the time mentioned in such section. That overlooks the fact that the real test is, what remedy was afforded the corporation to enforce its rights in the circumstances set forth in the complaint before the adoption of the Code. We need spend no time to demonstrate that it had then, as it has now, a remedy at law in such cases. It follows that before this action was commenced a cause of action of the corporation was extinguished and that with it necessarily the right of the plaintiffs to enforce such cause of action was lost. That is dis-

tinctly ruled in *Boyd v. Mut. Fire Asso.* 116 Wis. 155, 94 N.
W. 171.   We are unable to discover anything in that case,.
or in *Buttles v. De Baun,* 116 Wis. 323, 93 N. W. 5, or *Mer-
ton v. O'Brien,* 117 Wis. 437, 94 N. W. 340, referred to by
counsel, that can save this case.   The effect thereof is that the
statute of limitations does not run in favor of a trustee of an
expressed interest of that continuing nature cognizable only
in a court of equity.   There is nothing of that sort involved
in this case as is plainly ruled in *Boyd v. Mut. Fire Asso.
supra.*

It is suggested by counsel for respondents that the corpora-
tion was powerless to assert its rights within the life of its.
cause of action because those who were solely in charge of its-
affairs were the guilty persons, and by their position pre--
vented any one during such period from obtaining knowledge-
of the facts so that they might act in its behalf.   While coun-
sel earnestly insist that under such circumstances the statutes.
of limitation ought not to apply, no authority is cited to our
attention varying the unqualified language of such statutes.
So far as we are advised, there is no exception to the rule of
the statute to fit a case of this sort.   Views elsewhere are
well portrayed in *Bank of Hartford Co. v. Waterman,* 26
Conn. 324–330, thus:—

"Ignorance of his rights on the part of the person against
whom the statute has begun to run, will not suspend its opera-
tion.   He may discover his injury too late to take advantage
of the appropriate remedy.   Such is one of the occasional
hardships necessarily incident to a law arbitrarily making
legal remedies contingent on mere lapse of time.   Strong
equitable considerations in favor of the present plaintiffs
seem, however, to grow out of the fact, that they were actually
*betrayed* into ignorance of their rights by the wrongful acts.
of the defendant himself. . . . It is palpably unjust for
the defendant to set up the statute as a defense under such
circumstances; to do so is in one sense taking advantage of
his own wrong.   Yet it is difficult to see that he is not, by the
clear provisions of the statute itself, protected in so doing.

. . . Lord CAMPBELL properly suggests, relative to a controversy not unlike to the present, that 'hard cases must not make bad law.' . . . If the dictum of Lord MANS-FIELD that 'there may be cases which fraud will take out of the statute of limitations,' were confirmed by direct adjudications, we should be reluctant to withhold the application of the doctrine in the present instance."

We cannot escape the conclusion that the statute of limitations pleaded had fully run in favor of the defendants before the commencement of this action and extinguished their liability.

*By the Court.*—The judgment is reversed and the cause remanded with instructions to enter judgment dismissing the complaint with costs in favor of the defendants.

The respondents moved for a hearing, and the following opinion was filed January 31, 1905:

MARSHALL, J.   The motion for rehearing, in this case, as all such motions which are made in the proper professional spirit are, was welcomed here and has received consideration. There was no need whatever for the learned counsel's apology for making it.   It were better if they had omitted from the argument the words "Well, as I understand the aversion of this court to rehearings."   It involves an assumption that has no foundation whatever.   This court has no "aversion" to the assertion by any attorney of any right which the statute, court rules or the practice affords him.   It has no feeling but that of respect for all considerate efforts of members of the profession to safeguard the rights of their clients and to aid the court in the proper administration of justice.   Occasions have been improved to admonish practitioners to exercise care not to subject their clients to the burdens of additional cost by inconsiderate motions for rehearings, and if it be necessary in order that such admonition shall be efficient in that regard it might well be repeated.   It is well appreciated here that

counsel may inadvertently overlook some important matter and that the court may do so, giving rise reasonably to the thought that if such matter had been fully presented and considered a different conclusion might have been reached. No feeling of hesitancy exists here to correct errors of counsel or the court's own errors whenever there is opportunity therefor. However diligent we may be to discover the right of any matter, mistakes are liable to occur, calling for motions for rearguments. That is well understood. The ultimate end sought by all is to weigh out justice with the greatest possible certainty and accuracy and nothing consciously is allowed here to stand in the way thereof. Certainly, no "aversion" to the reception of a motion for a rehearing so stands. The statutory right to make such motion is a valuable aid to the end sought when invoked with that careful consideration of a case which should always be devoted thereto before exercising it. *Brown v. C. & N. W. R. Co.* 102 Wis. 150, 77 N. W. 748, 78 N. W. 771; *Illinois S. Co. v. Bilot,* 109 Wis. 430, 84 N. W. 855, 85 N. W. 402. If counsel conclude that a question for any cause has been overlooked or not adequately presented, and a re-presentation of the case in that regard may, with reasonable probability, change the result, they should perform the duty to their clients and the court to make the motion to that end.

Counsel now present for consideration propositions which only incidentally, if at all, were mentioned on the former argument. They frankly confess that the importance of such propositions was not appreciated by them, if thought of seriously at all, until aroused in that regard by some questions propounded from the bench on the argument. We will say, however, at the outset, that the subjects involved did not pass here without the most careful study, as the result will now more fully indicate.

Counsel's second proposition, it would seem, ought to have first place. "The right of action at law upon the subscrip-

tion list signed by these defendants did not accrue in favor of the corporation in 1892, and it did not accrue until these plaintiff stockholders made their demand for action in February, 1899, and the defendant then denied any liability and refused to take any action." In support of that it is said there was no right of action in advance of a call being properly made and the maturity of the demand thereunder, the statute on that subject and the articles of organization of the corporation and its by-laws being referred to. We have not heard before anything to indicate that any one supposed this to be an action to recover upon the contractual liability of stockholders. There is no suggestion in the complaint that it is of that character. On the contrary, the whole theory from first to last has been that it is an action against the promoters and trustees of a corporation to recover unlawful profits they obtained while acting in a fiduciary capacity for it. The claim of the plaintiffs all through the case is that defendants, while acting in such fiduciary capacity, purchased land at one price and turned it over to the corporation ostensibly at cost, but really for an advance of over $50,000, and that to the extent of the profits so obtained they became liable to such corporation. The mere statement of the real nature of the action, which is fully set forth in the history of the case accompanying the former opinion, renders it unnecessary to say more on this point.

Counsel's next proposition is that "the defendants are estopped from setting up and receiving the benefit of the six-years statute of limitations." That presents the question of whether such statute, as to an action in favor of a corporation against its officers, runs while they themselves are the ones clothed with the sole authority to protect its interests and fraudulently neglect to do so. True, as said by counsel before and as said now, the corporation was powerless to enforce its right to recover the unlawful profits through the instrumentality of its officers, since they were the guilty parties and con-

trolled what should and what should not be done in its behalf. Formerly, we said: Counsel insist that under such a situation the statute ought not to apply, but no authority is cited to our attention as a basis for varying the unqualified language thereof, and so far as we can discover there is none to fit the case in hand. Reflection has resulted in counsel planting themselves squarely and confidently on the unqualified doctrine that the statute of limitations does not run in favor of one seeking to take advantage of it, as to a cause of action based on fraud, so long as the adverse party has no knowledge of the facts constituting such fraud. A large number of authorities are cited to our attention as supporting that view, commencing with *Encking v. Simmons,* 28 Wis. 272, where Dixon, C. J., used language by way of argument suggesting that a view was then entertained, at least by himself, that the statute of limitations might be avoided for actual fraud. No question in that regard, however, was in any wise involved in the case, even incidentally, nor was the doctrine suggested indorsed as good law by the writer of the opinion, except inferentially:

"There is (said the chief justice), for example, very much and very high authority for saying that the bar of the statute of limitations may be avoided at law for fraud in the party seeking to take advantage of it."

True, there is such authority that way, but also true when analyzed the same is found to have no application whatever to a situation wholly otherwise regulated by statute, as in this state. It is significant that the remark quoted, though made over thirty years ago, has not since been referred to in any opinion in this court, and that the doctrine there said to be supported by "very much and very high authority" has never been incorporated into our system. A brief history of such doctrine will fully clear up all uncertainty, if any exists, as to whether it should be adopted here.

The whole system of extinguishing rights, or rights of ac-

tion, by delay in their enforcement is really statutory.    True, at an early day in England by the dictum of Lord MANSFIELD in *Bree v. Holbech,* 2 Doug. 654, the idea is said to have been originally advanced that fraudulent concealment prevents the running of the statute of limitations.    It is truly said by the text-writers that such idea was never judicially incorporated into the English sytem as law, but was by act of Parliament. At an early day in this country it was adopted by some of the states, notably by Massachusetts and Maine, and later was adopted by some others.    It was incorporated into the statutes of many of the states in some form, in some cases being restricted, either expressly or by judicial construction, to actions at law, and in others to actions in equity.    That accounts for all of the decisions referred to in *Encking v. Simmons,* and the large addition now cited to our attention by counsel.    In Wood, Limitations (2d ed.) § 274, the matter is referred to in these words:

"In Massachusetts, before the present statutory exception existed, the fraudulent concealment of a cause of action was held to be a good replication to a plea of the statute.    In Maine, also, this rule was adopted.    The doctrine of these cases was predicated upon a dictum of Lord MANSFIELD, in an English case; but this dictum seems never to have been followed in the English cases in actions at law, nor do the American cases before cited seem to have been generally followed in this country."

There are three general classes of authorities found in the books on the subject under discussion and unless the statutory differences giving rise thereto are appreciated one is quite liable to fall into confusion as to how the law ought to be declared under a statute like ours.    The first includes the states where there is no statute on the subject, holding that fraud concealed by the person invoking the statute of frauds postpones its operation. They are, in the main, the following: Massachusetts and Maine, prior to the adoption of their statutes on the subject, Vermont, Rhode Island, New Hampshire,

Louisiana, New Jersey, Arkansas, Delaware, Pennsylvania and Texas. Sixteen of the cases cited by counsel are from those states. That they throw no light on what the rule ought to be where the matter is governed by statute, seems plain. The second class includes the states having a general statutory exception to the running of the limitation statutes in case of concealed fraud until the discovery of the facts by the injured party. They are: Maine and Massachusetts, after the adoption of their present statute, Connecticut, Alabama, Georgia, Indiana, Illinois, Mississippi, Maryland, Michigan and New Mexico. Ten of the cases cited to our attention are from those states, and no time need be spent in showing their inapplicability to the case in hand. The third class includes states having such a statutory exception in cases cognizable in equity, or solely so cognizable. They are: Iowa, Colorado, Florida, Kentucky, North Carolina, South Carolina, Kansas, Missouri, New York, Ohio, Nebraska, Nevada, California, Arizona, Minnesota, Utah, Idaho, Montana, Wyoming and this state. Of the sixty or more cases cited by counsel, there is no Wisconsin case,—except *Encking v. Simmons,* 28 Wis. 272, which decided nothing on the subject, as we have seen,—and no others in such class, except *Oakland v. Carpentier,* 13 Cal. 540; *Ryan v. L., A. & N. R. Co.* 21 Kan. 365; *Ft. Scott v. Schulenberg,* 22 Kan. 648; *Arnold v. Scott,* 2 Mo. 14. An explanation of those cases can be very briefly given. The California case was not an action at law, or an equitable action to enforce one at law, as is the case before us, but was strictly an action cognizable only in equity, and so in harmony with the statute on the subject. The court held that the limitation period did not begin until the discovery of the facts constituting the fraud. The same is true of the first of the Kansas cases referred to, and the other, so far as it touches on the subject at all, seems to be against the contention counsel seeks to maintain. As to the Missouri case, counsel was either misled by the syllabus, which does not correctly state

the rule of the case, into citing the decision, or by a citation in some publication where the author was so misled. The decision was based on a clause of the Missouri statute which provided that any obstruction of the action, whether by direct or indirect means, will, while it lasts, postpone the running of the limitation period. We have no such statute. The case was explained and limited in *Smith v. Newby,* 13 Mo. 159, where it was said that the syllabus was misleading.

As to concealed fraud postponing the running of the statute of limitations respecting a cause of action at law, it has been expressly repudiated in the following states having statutes similar to ours: New York, *Troup v. Smith's Ex'rs,* 20 Johns. 33; Kentucky, *Ellis v. Kelso,* 18 B. Mon. 296, where a clerk made a fraudulent entry upon his employer's books, and it was held that the statute ran from the date of the entry; North Carolina, *Hamilton v. Shepperd,* 3 Murph. 115; South Carolina, *Miles v. Berry,* 1 Hill, 296, where the maker of a note fraudulently obtained possession of it, and kept it until the statute had run upon it, and it was held that such fraud did not prevent the running of the statute. The same rule has been declared in the following cases belonging to the first class, or having a statutory provision like that which ruled *Arnold v. Scott,* 2 Mo. 14: Mississippi, *Wilson v. Ivy,* 32 Miss. 233; Virginia, *Rice v. White,* 4 Leigh, 474. The same rule prevails in states belonging to the second class: Tennessee, *York v. Bright,* 4 Humph. 312; *Smith v. Bishop,* 9 Vt. 110; *Fee's Adm'r v. Fee,* 10 Ohio, 469.

Thus it will be seen that of all of the authorities cited by counsel there is no support whatever for the proposition advanced that under a statute such as ours the running of the statute of limitations, except in the particular class of cases referred to in such states, is affected by fraud, while a careful classification of them with reference to the statutory differences under which they were made and judicial declarations all, directly or by implication, sustain the conclusion to which

we formerly arrived.   There are expressions of judges of
great ability to the effect that there is much conflict and con-
fusion in the authorities on this subject, but it is believed that
the supposed conflict does not exist in fact to any considerable
·extent.   Substantially all of what appears to have led to a
contrary view, by a proper classification of the decisions ac-
·cording to the various statutes, will be found to have no real
basis.   We have not attempted here to do more than to
·classify them in a general way.

Counsel suggest that the language quoted in our former
opinion from *Bank of Hartford Co. v. Waterman,* 26 Conn.
324, is not authoritative because it was entirely unnecessary
to the case, and, further, because many cases could have been
found at that time where it had been held that fraud, con-
·cealed, prevented the running of the statute of limitations.
True, there were such cases and we have briefly, but fully, ex-
plained them in harmony with the views formerly expressed.
The quotation voices the law under the Connecticut statute.

Several federal cases are cited to our attention, which, when
rightly understood, are unimportant.   *Bailey v. Glover,* 21
Wall. 342, is the most significant of them.   That is to the ef-
fect that under the federal system the rule is, as to cases not
governed by state statutes and decisions, the court being left
free to declare the law according to its own views, and there
being no federal statute interfering therewith, the running of
the statute of limitations is postponed in case of fraud, con-
cealed by the party invoking such statute, till the adverse
party discovers the same.   If there had been a United States
statute expressly providing when fraud shall so operate, the
decision would doubtless have been that all cases not covered
thereby were excluded.   In *Troup v. Smith's Ex'rs,* 20 Johns.
33, the court was urged to engraft on the statute of limitations
·of New York an exception saving actions at law from the oper-
ation of such statute in case of concealed fraud, preventing

their being commenced within the limitation period, and replied thereto, thus:

"The dictum of Lord MANSFIELD, in *Bree v. Holbech,* 2 Doug. 654, is the only instance in which such a position was ever advanced in Westminster Hall; and when it is further considered, that his lordship had an inclination to entrench on courts of equity, that mere dictum cannot be regarded as authority. . . . Courts of law are expressly bound by the statute. . . . I know of no dispensing power which courts of law possess, arising from any cause whatever." The court said further, substantially: The statute having made provision for the postponement of the running of the statute of limitations in certain cases it would be an assumption of legislative authority to introduce any other. "The plaintiff's case may be a hard one; but that affords no reason for construing away a statute of great public benefit, and which, in many cases, is a shield against antiquated and stale demands."

That decision made over seventy years ago has stood the test of time without a word of criticism in New York, or elsewhere under a like statutory system to that which the court had under consideration.

In *Miles v. Berry,* 1 Hill, 296, speaking on the same subject, the court said:

"Many of the difficulties, in cases upon the statutes of limitations, have arisen from losing sight of the words of the statute, and looking to what appeared to be just and right between the parties. The judges here and elsewhere have, however, set about the work of reform in this respect, and are now endeavoring to conform to the statute." To allow the time of the discovery of the fraud to be regarded as that of the maturity of the injured party's cause of action "would be to make and allow, by judicial construction, an exception to the statute of limitation, which the legislature did not think proper to make."

In line therewith Chancellor KENT said in *Demarest v. Wynkoop,* 3 Johns. Ch. 129–142: "The doctrine of any inherent equity creating an exception as to any disability, where

.the statute of limitations creates none, has been long, and, I believe, uniformly exploded. A statute is to be read as it is written without any arbitrary substitution or addition to its meaning." To the same effect are *Carden v. L. & N. R. Co.* 101 Ky. 114, 39 S. W. 1027; *Powell v. Koehler,* 52 Ohio St. 103, 39 N. E. 195; 19 Am. & Eng. Ency. of Law (2d ed.) 212.

In the light of the foregoing, it would seem that the right of ·the matter under discussion is unmistakable. The statute, sec. 4222, Stats. 1898, provides that "the cause of action in such case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud." By one of the most familiar canons of construction all other cases are thereby excluded. *"Expressio unius est exclusio alterius."* The mere fact that the enforcement of the statute according to the foregoing leads occasionally, as it does seemingly in this case, to great hardship does not furnish the ·slightest reason why the courts should ingraft an exception upon it. The enactment of the lawmaking power within its legitimate field must not be obstructed by the judicial administration. Such power is ample, if it sees fit, to extinguish any right enforcible by an action, if judicial remedies for .such enforcement are not invoked within such reasonable time as it sees fit to name. The possessor of the right may be under disability to personally enforce the same within the pre-·scribed period by reason of infancy, insanity, imprisonment ·or other cause, and yet the statute in general terms, not containing any exception to save the right, will extinguish it. *Vance v. Vance,* 108 U. S. 514, 521, 2 Sup. Ct. 854; *Carden v. L. & N. R. Co. supra.* The legislature is the judge, and the sole judge in such matters, subject to no judicial review whatever, so long as it acts within the boundaries of reason. It is far better that occasionally one should suffer severely .from the enforcement of the law, as the court finds it, than ·that they should endeavor to bend the law out of its manifest

scope to avoid that result. The truth of the saying that "hard cases make bad law" we need not go far to demonstrate. After courts have done all that they can by the exercise of the greatest diligence to steer clear of the danger in that regard they cannot hope to be universally successful.

We should not close this opinion without referring, at least briefly, to the doctrine urged upon our attention that equity will always furnish a remedy for any wrong, other than a mere moral transgression, if legal remedies are inadequate or do not exist at all. It is not infrequently that we see that valuable doctrine invoked where it has no proper place. It is never applicable to give a remedy for a wrong, so called, which is not a wrong at all, because the written law makes it otherwise. Such wrongs, if the injuries may be so designated at all, are not within the maxim "there is no wrong without a remedy." *Rowell v. Smith, ante,* p. 510, 102 N. W. 1.

The last suggestion of counsel is that respondents having proceeded in good faith should not be made to pay costs in this court or in the court below. Such a practice, if once adopted, would compel the defendant in most any case to wholly bear the burden necessary to his defense, since, generally, the plaintiff thoroughly believes in his side of the case. There is no good reason for making this case an exception to the general practice of awarding costs to the defendant where in an equity action he prevails as to the entire cause of action set forth in the complaint. According to the conclusion to which we have arrived the defendants have so prevailed.

*By the Court.*——The motion is denied.