Guile v. La Crosse Gas & Electric Co. 145 Wis. 157.

Guile, Executrix, Respondent, vs. La Crosse Gas & Electric Company, Appellant.

*January 31—February 21, 1911.*

*Master and servant: Personal injury: Explosion of gas: Unsafe appliance: Evidence: Questions for jury: Notice of injury: Failure to serve, induced by master's conduct: Estoppel: Statutes of limitation.*

1. In an action against a gas company for personal injuries to an employee caused by an explosion of air mixed with gas which had escaped in the purifying house, a finding by the jury that the gas was ignited and exploded by a spark from the electric lamp inside said house is *held* to be sustained by the evidence, although officers of the defendant testified that the electric cur-

rent had been turned off from said house previous to the acci-
dent, and there was other testimony tending to show that plaint-
iff entered the house with a lighted torch.

2. It appearing by the evidence that "blowouts" frequently occurred
in the purifying room resulting in an escape of gas which, being
mixed with the air, created a highly explosive mixture readily
ignited by a spark, and that the electric lamp in use was likely
to emit a spark when the current was broken, it was a question
for the jury whether such electric lamp was, under the circum-
stances, a reasonably safe appliance for that place.

3. Findings by the jury upon sufficient evidence that within a year
after personal injury to a servant the master represented to
him, in substance, that he need not serve any notice of injury
in order to preserve his rights against the master, that an in-
surance company was bound to pay him his damages resulting
from such injury, and that the master would enforce such claim
for him; that the servant had reasonable cause to believe from
such representations that he was excused from serving a notice
of injury within the year; and that he failed to serve such no-
tice because he relied upon such representations, constitute a
sufficient basis for holding the master estopped from insisting
that such failure to give notice barred the action under subd. 5,
sec. 4222, Stats. (1898), if an estoppel *in pais* can have such ef-
fect.

4. The provision of subd. 5, sec. 4222, Stats. (1898), that no action
to recover damages for an injury to the person shall be main-
tained unless the notice therein prescribed shall be served
within a year, although a statute of limitation, differs in its
nature and purpose from ordinary limitation statutes and de-
mands the application of different rules of law. All of its re-
quirements being such that the person subject to be charged may
willingly forego them, and may therefore readily induce the in-
jured person to believe that he will forego them, if a failure to
give the notice has been reasonably induced by the defendant
he may be held to be estopped from insisting upon such default
as a bar to the action.

MARSHALL, J., dissents.

APPEAL from a judgment of the circuit court for La Crosse
county: A. H. REID, Judge. *Affirmed.*

This is an action to recover damages for personal injuries
suffered by the plaintiff, Henry Marquardt, through an ex-
plosion of a mixture of gas and air in the purifying house of

the defendant's gas plant.    It is claimed that the explosion was caused by the negligence of the defendant.

The defendant made its gas from coal.    The gas is extracted from the coal by applying heat to the retort in which the coal is placed.    When the gas has been extracted from a charge of coal in a retort and it is desired to recharge the retort with a fresh supply of coal, a torch is used to light the gas remaining in the retort and coke.    From the retorts the gas is conducted to the four purifying boxes in the purifying house after undergoing processes which are not material to this case.    These boxes are between eleven and twelve feet in width and between fourteen and fifteen in length.    Along the upper edge of the purifying boxes was a trough twelve or fourteen inches deep around the whole edge of the box.    A flange along the edge of the covers of the boxes fitted into the troughs.    Water poured into the troughs sealed the boxes and prevented the escape of the gas from the boxes.    The boxes extended below the floor and projected about a foot above the floor of the purifying house.    They were placed in a row lengthwise of the boxes and of the purifying house, and were filled with oxide of iron mixed with shavings to remove sulphur hydrogen from the gas passing through.

The door into the purifying house was in the east wall of the building opposite the space between the two center boxes. Tar and other foreign substances were removed from the gas while it passed from the retorts to the gas reservoirs.    The purifying house was lighted by electricity.    A switch outside of the building near the door controlled the three lights on the one circuit in the building.    One of the lights, near the door and also near a gauge, had a key switch in the socket which could be reached from the floor and which could control this light if the current was turned on through the outside switch.    The other two lights were without such socket key switches and were out of reach.

Whenever the retorts are overcharged so that gas is pro-

duced more rapidly than it can be handled in the purifying boxes, when the gas holder sticks and cannot receive the gas from the purifying boxes, or when friction in the pipes or stoppages therein produce an overpressure in the purifying boxes, this overpressure forces the water from the troughs of the boxes and allows the gas to escape into the room of the purifying house. This is known as a "blowout." The overpressure of gas in the purifying boxes may be temporary or permanent. If temporary, the troughs are refilled with water and the box thus sealed again. If permanent, other measures must be taken to relieve the pressure to enable the production of gas to go on.

There was evidence in the case that a mixture of gas and air in the proportions of one to seven or eight would be very explosive and might be exploded by the spark produced by breaking an electric current with a key switch such as was in use on the light near the gauge in the purifying house.

The accident happened between 11:30 p. m. and midnight on May 19, 1906. Plaintiff had worked for the defendant for about fifteen months as laborer and fireman, and three or four days before the accident he had been made head fireman. As head fireman he had charge of the works and had two other firemen under him, and had direct control of the charging of the retorts. The retorts had been charged and the firemen were about to eat lunch. The plaintiff went out of the retort house to the meter room and noticed that the meter indicated that gas was not going into the holder but was coming from it. On looking into the engine room he found everything all right there, but on going out of doors he heard a noise in the purifying house which meant that gas was escaping because of a blowout.

The plaintiff testified that when he became assured that there was a blowout he went into the retort house and told the firemen of it and directed them to bring some water. They ran out and he took a pail, filled it with water from a barrel

in the retort house, ran with it to the purifying house, and poured the water into the seal of the box which had the blowout. When the men came in with the pails of water he showed them where to pour it and told them to get more. They went out, and he needing light felt for the switch near the door, turned the key, and immediately an explosive flash followed.

The evidence showed that the side walls of the purifying house were blown out and down, the roof fell upon the boxes and caught fire from the burning gas which was escaping from the box which blew out, and the plaintiff was caught under the roof and severely injured and burned.

The two assistant firemen, Wagner and Dumke, testified that the plaintiff came into the retort house as they were preparing to eat lunch, told them there was a blowout, and directed them to get some water. They ran for water, and each carried a pail of water into the purifying house and emptied it into the seal of the box which had blown out. They immediately turned about to go out of the house for more water and met the plaintiff coming toward the house with a pail of water in one hand and a lighted torch in the other. One of the assistant firemen testified that he told the plaintiff to "Look out for the torch." The other testified that he heard the other fireman call out something about a torch. They had gone but a short distance from the building when the explosion occurred. One of these firemen telephoned for the fire department, notified the officers of the defendant of the accident, and then removed some of the *debris* and from the ruins pulled the plaintiff, who was lying under the roof near the burning gas and was being burned by it. The fire department responded, extinguished the fire; and in doing so sealed the purifying box and extinguished the gas.

The theory of the defendant is that the explosion was caused by the lighted torch which it is claimed the plaintiff carried into the purifying room filled with escaping gas. As

tending to support this theory there was evidence by the officers of the company that the plaintiff admitted while at the hospital that he had carried the lighted torch into the building; one of the officers testified that he had tested the lights that day and found them all right; an officer of the company testified that the next day he found the torch, the plaintiff's hat, and the pail in which he carried water near the door; one of the officers testified that he had turned off the current from the purifying house by the outside switch, leaving no current in the wires, about an hour before the explosion; the firemen testified, as stated above, that the plaintiff carried a lighted torch toward the building shortly before the explosion; one of them testified that he was present when the torch was picked up the next day, and that when work was resumed that night and it was desired to light the gas in the retorts preparatory to recharging them it was necessary to make a new torch because the one which had been used for this purpose was missing.

There was evidence tending to show that the plaintiff was not fully conscious when he was interviewed at the hospital, and the plaintiff's daughter testified to admissions of the two firemen that the plaintiff did not have a torch at the time of the explosion.    There was evidence tending to show that there was no light in the purifying house when the firemen went into it.    The plaintiff testified that he did not turn on the current by the outside switch, and he admitted that he did not know whether or not there was a light in the house when he went in, and claimed that if there was such a light it was obscured by the steam and vapors arising from the "blowout."

The plaintiff admits that no notice of the accident and of a claim for compensation was served upon the defendant within a year.    There was evidence that the officers of the defendant told the daughter of the plaintiff that it was not necessary to serve any papers upon them, that any damages

would have to be paid by the insurance company in which the defendant was insured against damages because of injuries to employees; that the officers of the defendant stated to the daughter of the plaintiff that they would do all they could to obtain damages for the plaintiff from the insurance company; and there was evidence of an offer of $100 from the insurance company to the plaintiff on condition that he would give an absolute release of his claim. It was admitted that the offer was made and the promise given that defendant's officers would do what they could to obtain something from the insurance company for the plaintiff.

The jury found by special verdict that the escaping gas in the purifying house was ignited and exploded by an electric spark emitted from the electric light inside the house when the plaintiff operated the key at the socket to turn on the light; that the electric lighting equipment was not reasonably safe for the use of the plaintiff in performing his duties in defendant's employment; that the plaintiff's injuries were the natural and probable consequence of this want of reasonable safety; that the defendant ought to have foreseen that the plaintiff's injuries might probably result from the lack of such reasonable safety; that the defendant's officers represented to the plaintiff that it was not necessary for the plaintiff to serve notice of the injury and of his claim for damages in order to preserve his rights against the defendant; that the defendant's officers represented to the plaintiff that the insurance company was bound to pay plaintiff's damages; that the plaintiff had reasonable grounds for believing from these statements or representations that he was thereby excused from serving a notice of the injuries and his claim for damages; and that the failure to serve the notice was caused by his reliance upon these statements and representations. The damages were assessed at $10,750.

The court denied a motion to change the verdict and for judgment on the verdict as changed, denied a motion for a

new trial, and ordered judgment upon the verdict. This is an appeal from the judgment.

On January 31, 1911, in this court the death of the plaintiff was suggested, and the cause was thereupon revived and continued in the name of *Anna Guile,* executrix, as respondent.

For the appellant there was a brief by *McConnell & Schweizer* and *Woodward & Lees,* and a separate brief by *Quarles, Spence & Quarles,* and oral argument by *C. H. Schweizer* and *A. C. Fish.*

For the respondent there was a brief by *Morris & Hartwell* and *Frank Winter,* and oral argument by *Mr. Winter* and *Mr. Thomas Morris.*

The following opinion was filed February 21, 1911:

SIEBECKER, J. The finding of the jury that the explosion was caused by an electric spark is assailed by appellant as an impossibility under the evidentiary facts of the case, and it is argued that if it be assumed that the explosion could have been caused by such an electric spark then the verdict cannot stand because plaintiff's evidence on this subject is inherently improbable and is impeached by the physical and undisputed facts in the case, and it therefore can furnish no basis for an inference that the explosion was caused in this way. The argument is that the impossibility of an explosion by an electric spark is established because it appears without dispute that the electric light wires within the purifying room were dead, that is that they were not charged with electricity. This is claimed on the ground that the evidence of the defendant's officers and employees showed that no electric current could reach these wires except by a connection made through the switch on the outside of the building, and that it conclusively appeared that the current had been switched off at that point by Mr. Speering early in the evening; that it appeared that no one turned it on before the explosion oc-

curred; and that the darkness of the ceiling and pit lights within the room up to the time the plaintiff entered it to seal the purifying box with water establishes that there was no current on these wires. The evidence on which the appellant relies is, however, contradicted by the facts as testified to by the plaintiff, which tend to show that when he turned the key of the lamp at the wall near the purifying box there was an instantaneous flash and explosion and an immediate collapse of the building. It appears that if an electric spark was emitted from the socket of a lamp like the one in use at this place it was likely to ignite the gas as mixed with air in the room as a result of the blowout.

It is furthermore contended that the evidentiary facts conclusively show that the center lights in this room were intact and would have lighted the room if the outside switch had been turned on, and that the evidence indisputably establishes the fact that these lights were not lighted when the plaintiff entered the room and attempted to turn on the gauge light. True, the witnesses stated that the purifying room was dark. There is also evidence that the room was darkened from the blowout; that there was steam and vapor in the air of the room; that there was no special notice taken of the lights by the witnesses, but that they could see the boxes and where to pour the water to seal the box. This state of the evidence presented an issue of fact as to whether or not the lights were in fact lighted, and whether or not the wires were charged with an electric current. The inferences on this subject were for the jury and the questions were properly submitted to them for determination. Hence we cannot disturb the rulings of the trial court to this effect.

The contention is made that the court should have held as matter of law that the explosion was caused by a lighted torch carried by the plaintiff. The evidence material to this point is conflicting and contradictory, as is shown by the foregoing statement, and presented a question of inferences therefrom

which could only be drawn by a jury and was therefore properly submitted to them. The evidence sustaining the jury's findings on these questions is not of the kind that deals merely in conjecture or bare possibilities, but is direct and positive on the subjects, and from it the jury had the right to infer that the explosion was caused by an electric spark emitted from the socket when the plaintiff attempted to light the gauge lamp.

The jury found that the lighting equipment of the purifying room did emit a spark, that it caused the explosion, and that the appliance, under the facts and circumstances, was not a reasonably safe one for the use of the plaintiff in the performance of his duties. This conclusion appellant does not specifically assail in argument, otherwise than under the foregoing head to the effect that the evidence is insufficient to show that the explosion was caused by a spark. It appears that blowouts frequently occurred in the purifying house and that the air would thereby become charged with gas, creating a highly explosive mixture which a spark could readily ignite, and that such a combination of conditions was known to be very dangerous to persons' safety, in and about the purifying room. It is not disputed but that such an appliance was likely to emit a spark when the current was broken. In the light of these facts it was for the jury to determine whether the electric light appliance, as installed in the purifying house, was, under the circumstances, a reasonably safe equipment in this room. Their verdict on this subject must be accepted in the case as establishing that the defendant did not furnish a reasonably safe equipment for the protection of the plaintiff and others who were engaged to perform services in this room.

The finding of the jury is that within a year after plaintiff's injuries the defendant's officers represented to him that an insurance company was bound to pay him his damages re-

sulting from such injury and that they would enforce such claim for him; that the plaintiff had reasonable cause to believe from such representations that he was excused from serving a notice of injury and for damages within the year from the time of accident in order to preserve his right to enforce any claim for damages against the defendant; and that the plaintiff failed to serve such a notice within the year because he relied on such representations of the defendant's officers. It is urged that the evidence does not sustain these findings of the jury. An examination of the evidence has convinced us that these findings of fact are sustained by the evidence of the plaintiff and his daughter. It was peculiarly within the province of the jury to determine what representations, if any, were made by the defendant's officers in this respect, in view of the sharp conflict between the witnesses testifying on this subject. In resolving these issues of fact the jury accepted the evidence of the plaintiff and his daughter as to what was stated by these officers. Their evidence amply justifies these findings, as incorporated in the special verdict on this branch of the case, and they must be treated as verities in the case.

Upon the verdict the circuit court held that the defendant was estopped from relying on sec. 4222, Stats. (1898). Subd. 5 of this section provides that in actions of this class, notice in writing, properly signed, shall be served on the party alleged to have caused the damage, "stating the time and place where such damage occurred, a brief description of the injuries, the manner in which they were received and the grounds upon which claim is made and that satisfaction is claimed, . . ." and that such notice shall not be deemed insufficient or invalid on account of inaccuracies or failure as to these requirements if it appears that the claimant did not intend to mislead the other party and did not in fact mislead him. The court considered that the conduct of the defend-

ant's officers, as found by the jury, was naturally calculated to justify the plaintiff in remaining inactive in the matter. In this conclusion, as to the effect of such conduct, we concur.

We are brought to the vital question raised by the appeal, namely: Can an estoppel *in pais* arise out of such oral statements and constitute a bar to prevent the defendant from invoking the provisions of subd. 5, sec. 4222, Stats. (1898)? The section is a part of the statutes of limitation. In a former decision of this court (*Arp v. Allis-Chalmers Co.* 130 Wis. 454, 110 N. W. 386) it was declared in respect to this statute that:

"The clause in question is a statute of limitations. [Citing.] True, its operation is somewhat different from the operation of other statutes of limitation in that it acts upon the time within which a preliminary notice shall be served instead of the time within which the summons shall be served, but it is none the less a limitation upon the right to maintain the action."

In *Hoffmann v. Milwaukee E. R. & L. Co.* 127 Wis. 76, 80, 106 N. W. 808, the court, in dealing with the question of whether the exemption of minors from the operation of limitation statutes during minority should apply to these provisions respecting notice in personal injury cases, said:

"The disability statute plainly exempts minors· from the operation of the statute limiting the time for commencement of actions only, and has no reference to the statute providing for the service of notice. Counsel has quoted from various decisions of this court to the effect that this law requiring notice is a statute of limitation, and in the sense used by this court in *Relyea v. Tomahawk P. & P. Co.* 102 Wis. 301, 78 N. W. 412, and other cases, it is a statute of limitation in that it imposes a condition upon the right to maintain the action, which must be performed within one year, but is in no sense a limitation upon the time for the commencement of actions, and it is very clear that the disability statute refers only to limitations upon the time for the commencement of actions."

In *Malloy v. C. & N. W. R. Co.* 109 Wis. 29, 85 N. W. 130, in speaking of the enactment of this statute of notice it is stated:

"The court should also consider the legislative purpose, and keep steadily in view 'the mischief to be cured.' [Citing.] Prior to the enactment of this statute a person suffering injury to his person had full six years to commence his action, and he was not required to give any notice of his intention. The necessity of notice arose from the fact that many claims were being prosecuted after long delays, when witnesses had disappeared or the circumstances were forgotten, and the means of evidence had been lost or destroyed. . . . Unquestionably, the legislative purpose was to require the injured party to inform the other within a reasonable time, fixed at one year, of his intention to hold him responsible. If he did so, then he might commence his action any time within six years."

From these cases it is apparent that this provision for notice in this statute of limitation is in its very nature different in purpose and object from the ordinary limitation statute fixing a time within which a person must institute an action to enforce a right. By reason of such differences their operative effect on the rights of persons may well demand the application of different rules of law in their interpretation and administration in order that the benefits they are designed to confer may be secured without inflicting any unnecessary hardships. It is asserted that our statute states what acts of a defendant will estop him from invoking the prescribed statutory bar of limitations, and that the decisions of this court in *Pietsch v. Milbrath,* 123 Wis. 647, 101 N. W. 388, 102 N. W. 342, and other cases establish that a person can be estopped in no other way than that prescribed by and specified in the statute, and that neither accident, mistake, nor fraud can operate to relieve a party from the bar of the statute. We find no cause for deviating from the rules recognized in these adjudications and believe that the rules there declared and applied are the

established law upon the questions there presented, and they are hereby fully approved. An examination thereof, how-ever, discloses that this court has in no case considered and adjudged that a party could not estop himself from invoking the bar of the statute here involved, namely, the failure of the plaintiff to give notice to the defendant in a personal injury action as required by subd. 5, sec. 4222, Stats. (1898). The nature and purpose of the statute have been fully stated above, and it is apparent that these provisions of the statute differ materially in their nature, purpose, and object from the ordinary limitation statutes prescribing a fixed period within which an action must be commenced after it has accrued. The main object is to apprise the defendant of the time and place of injury, to give a description thereof, to inform him as to how it was received, and of the demand for satisfaction of the damages. Every requirement thus imposed is of a nature which the person sought to be charged may willingly forego and therefore readily induce the injured person to believe he will forego, and thus lull him to remain inactive in the matter. Under such circumstances it has ever been deemed that equity should intervene to estop the person who by words or conduct has induced another to refrain from doing that which he would have done but for the action of the former, from asserting the forfeiture of the right he has so induced to the prejudice of the one who gave faith and credit to such conduct. We consider that this principle can justly be applied to parties acting within the provisions of this statute requiring notice of personal injury, and that its operation will be salutary and promotive of justice between the parties under the conditions here presented.

In its import this provision of the statute is analogous to the statutory regulation involved in *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571, wherein it was declared and held that the statute giving a widow a year after the petition for the probate of her husband's will had been filed for electing to take of her husband's estate such portion as the law pro-

vides instead of that provided in the will, is a limitation statute, which, when it runs, bars her widow's rights beyond the power of relief by legal or equitable remedies, in the absence of fraud entitling her to relief upon the ground of equitable estoppel.   It was there held that the widow should be allowed to repudiate the transaction upon discovery of the fraud which induced her not to make the election within the year, and she was given the right to prosecute the executors and trustees and to charge the property of the estate in their possession with a constructive trust for the amount she would have obtained had she made the election.   The two statutes serve like purposes and can appropriately be deemed to call for a like relief therefrom in case of default of compliance therewith under the same or similar circumstances.   *O'Donnell v. State,* 126 Wis. 599, 106 N. W. 18.

We are of the opinion that the fact that plaintiff's failure to give the notice required was wrongfully induced by the officers of the defendant was shown by the evidence, and that under these circumstances the defendant is estopped from insisting on the plaintiff's default as a bar to the prosecution of his action, and that the plaintiff should be permitted to proceed in the same manner as if the notice had been served as required by the statute.   This conclusion, as shown above, is not to be taken as applying to parties who seek relief from the bar of the provisions of the ordinary limitation statutes providing a time within which actions must be commenced after the cause of action has accrued.   It is stated in the *Ludington Case,* regarding the benefit of a completed period of a limitation statute within which actions must be commenced after they have accrued, that:

"Courts of equity as well as courts of law, and the legislature as well, are powerless to take that right away, as indicated by this court in *Van Steenwyck v. Washburn,* 59 Wis. 483, 17 N. W. 289."

The court properly awarded judgment on the verdict.

*By the Court.*—Judgment affirmed.

The following opinion was filed March 14, 1911:

MARSHALL, J. (*dissenting*). I cannot concur in the result in this case, nor in the reasoning upon which it is based. I am unable to find satisfactory evidence that the explosion was caused from turning on the electric light in the purifying room. At best there is the merest conjecture on that point. So the finding that it was so caused violates the rule that he who charges an injury to want of ordinary care on the part of another must prove to a reasonable certainty how the accident occurred and that such want of ordinary care proximately caused it.

Further, on the same subject, it seems that common knowledge condemns as wrong the idea that a spark was emitted at the switch of the electric light, as respondent turned it. There could not possibly have been a spark by merely turning the switch into contact. Only by turning the switch by the contact point so as to break after closing the circuit, could a spark have been made. If the current was on at all, the contact was not broken after having been made, for, in that event, the making and breaking were so near together that the light would not have shown appreciably. Respondent said there was a flash, then an explosion. If there were the two occurrences with an appreciable interval between so as to enable him to remember one separately from the other, the flash was from the incandescence of the filament in the electric lamp. No flash could possibly have been observed from a mere spark at the point of contact in the switch. That was inclosed. If a spark was generated there it was in a substantially tightly inclosed small space. It could not have escaped to attract observation, or, except by merest conjecture, have caused an explosion. If respondent saw a flash and then heard an explosion, and the turning on of the light made the flash, which seems out of all reason, unless the flash was from the incandescence of the filament as aforesaid, the flash could

not have caused the explosion. That and the cause of it must have been simultaneous.

But, if we were to concede turning the switch to have caused a spark in some way, which no one can explain with reasonable clearness, and that the spark generated in the socket caused the explosion, yet what reason is there for saying the purifying room was not reasonably safe? Actionable negligence is based on failure to exercise ordinary care— such care as the great mass of mankind exercise under the same or similar circumstances. That seems to have been ignored in this case, and the jury allowed to efficiently say the purifying room was not reasonably safe, merely because they believed the turning on of the electric light was an event liable to occur and that it caused the explosion. They set up their own standard instead of finding the fact by the legal standard. There is no room in the evidence, so far as I can see, for even a suspicion that the purifying room was not up to the ordinary standard of safety. It was common to have some way of furnishing light in the room when necessary. That is evident. The inclosed electric light was the safest that could have been thought of. It was armed with an outside switch so the current could be turned off outside the building, the contact then made at the lamp, and the current then turned on, avoiding any possibility of causing a spark of fire by closing and breaking the current in the purifying room. How then can it be said appellant wronged respondent by not providing a reasonably safe purifying room? I am satisfied from the record that the jury did not and could not, reasonably, have found the room not to be as safe as such rooms are ordinarily made. They simply concluded there was an explosion; that it was caused by the electric light and so was not reasonably safe. The court plainly instructed that if the purifying room was up to the ordinary standard of safety that was sufficient. The jury must have ignored that. If there is any evidence in the record to show that it was not as

safe as common, I am unable to find it.  My brethren do not point to any.

Now a word respecting the statute of limitations.  It is conceded that the law requiring notice of an injury to be served within a given time in order to preserve the right to maintain a cause of action for it, is a statute of limitations. It has long been so classed without a suggestion, heretofore, that the ordinary principles applicable to such statutes do not apply.  It is conceded that there is, in general, no way under our system of avoiding a limitation statute on the ground of estoppel *in pais;* that after the expiration of the statutory period bearing on a cause of action, the claim or demand is as though it had never been; that it is to be regarded as having been extinguished by the statute, leaving no relief whatever from such situation.  *Pietsch v. Milbrath,* 123 Wis. 647, 101 N. W. 388, 102 N. W. 342.  Not only is one right extinguished but a new one is created, which, like any other, is within constitutional guarantees against impairment. That is the settled policy of this state.  The court recognizes it in the opinion and does not, in general, intend to vary it or cast doubt on its wisdom.

In view of the foregoing, it seems somewhat strange that an important principle of public policy should, at this late day, be discovered to be subject to an exception which will save the cause of respondent.  The importance of certainty in our law cannot be overestimated.  Unless statutes to vitalize a single policy are uniformly construed most prejudicial confusion will result.  The maxim well applies, *Ubi jus incertum, ibi nullum.*

The saying is, that bad cases make bad law and so it seems sometimes.  No disrespect at this point to my brethren. What looks like bad law to some may well look like good law to another, and what looks like bad law upon one occasion is liable to take on a different aspect later on, and *vice versa.*

Hence the reason that persons in high stations charged with the duty of jointly declaring and applying the law should avoid the slightest semblance of want of fairness to the opinions of each other.

Dealing with the very statute in question, the court, in *Hoffmann v. Milwaukee E. R. & L. Co.* 127 Wis. 76, 106 N. W. 808, where the right of an infant was involved, and it was insisted that the law should be construed as excepting such during the period of their minority, the reply of the court was: "No exception is made in favor of minors in this statute and none can be engrafted upon it by the courts." That case and others give such statute all the characteristics and effects of statutes of limitations in general, as to which neither fraud, ignorance, nor disability, other than the statute expressly specifies, applies to prevent its running to effect or prevents its being pleaded with effect after having run. That is plainly the doctrine of *Pietsch v. Milbrath, supra,* which has been firmly entrenched in our policy. It has become a rule of property. It is the better rule if it is good policy to have limitation statutes at all. It is well supported elsewhere, though, true, it is not the universal rule. This court in speaking of it in *State v. C. & N. W. R. Co.* 132 Wis. 345, 112 N. W. 515, said:

"The presence of fraud in no instance postpones the running of the statute from the time the cause of action accrued, save the specified exception in subd. 7, sec. 4222, Stats. (1898), for relief on the ground of fraud in cases which before February 28, 1857, were cognizable solely by courts of chancery."

Again in *Uhlenberg v. Milwaukee G. L. Co.* 138 Wis. 148, 119 N. W. 810, the foregoing unbending unexceptional character was treated as the absolute essential of the statute. It was emphatically referred to, it being said in effect that there is no way of escape from its full effect so long as it remained on the statute books unchanged by the lawmaking power.

The only justification for the exception which the court now makes to the principle so firmly established, is that the reason for the particular statute is different from that of statutes in general; but the logic of that to my mind is infirm and obviously so. The reason for statutes of limitations; common to all, is phrased in 25 Cyc. 983, thus:

"The object . . . is to suppress fraudulent and stale claims from springing up at great distances of time and surprising the parties or their representatives when all the proper vouchers and evidences are lost or the facts have become obscure from the lapse of time or the defective memory or death or removal of witnesses."

Singularly enough the language in *Malloy v. C. & N. W. R. Co.* 109 Wis. 29, 85 N. W. 130, used to show that the statute in question was intended by the legislature as a statute of limitations because the thought was to cure the species of mischief at which statutes of limitations in general are aimed, is taken hold of now to show that such reason, while leaving the statute one of limitations, is to be regarded as taking it out of the most dominant principle of all statutes of the kind. That is to say, the reason which the court assigned in the beginning for holding the legislature intended the statute to be, in principle, a statute of limitations is leaned on now for support in taking it out of the essential principle thereof. It seems to me that if such statutes, of which there are many, are to vary in principle according to particular classes of situations they are designed to reach,—instead of being dominated by one principle,—are to be subject to such exceptions as the court in its wisdom may conclude to be equitable,—great confusion will result and the court will really usurp the functions of the legislature. When the reason for a particular act, and acts of the same general character, is the same they should have a common effect. That is but another way of stating an old maxim in the law, *Ubi lex est specialis, et ratio ejus generalis, generalitur accipienda est.*

The idea of the last foregoing is this: The characteristics of a statute of limitations having been fixed in this state many years prior to the enactment of the one in question, it must be presumed that it was the policy of the lawmaking power to incorporate such characteristics therein. It should be regarded so incorporated as plainly as if plainly expressed in words. The statute is not one of limitations merely because this court named it such. It is such because the legislature made it so and, of course, did it in view of established principles.

So I cannot see any logic in the judgment from which I dissent, in the court's suggestion that:

"By reason of such differences [differences which, as we have seen, do not exist in fact] their operative effect on the rights of persons may well demand the application of different rules of law in their interpretation and administration in order that the benefits they are designed to confer may be secured without inflicting any unnecessary hardships."

I cannot agree that the court can properly recast a law enacted within an established principle to minimize its effect according to judicial notions of equity giving "different operative effects on the rights of persons" of different acts, dominated by one broad policy. If a law is obscure it may be construed to effect the discovered intent, if after all such intent can be found expressed. If it be not obscure the court cannot interpret and administer in the manner stated without invading the legislative domain.

I cannot well leave discussion of the case without calling attention to the, seemingly, plain illegitimate use of *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571,—moreover of the language suggestive of having been substantially taken from the decision in that case, indicating that the effect of a statute of limitation, in general, may be obviated by equitable estoppel. Such language unconsciously perverted what was there decided, most harmfully.

It is agreed, I am sure, as to what has been the law of this state. The court has declared it in the cases I have cited and they are approved in the opinion of the court now, and understandingly, I have no doubt. Yet the purport of *Ludington v. Patton, supra,* is given an unwarranted cast *apparently* in conflict with *Pietsch v. Milbrath,* 123 Wis. 647, 101 N. W. 388, 102 N. W. 342, which is cited and approved. I am afraid the court's opinion will be read as approving a principle in the latter and justifying a departure from it by quoting, in a misleading way, from the decision in the former; not only creating an apparent conflict, where none exists in fact, but with seeming unconsciousness of the inconsistency. I most fully acquit my brethren of so intending while, necessarily, taking the liberty to respectfully state the situation as it appears to me and as I think it will appear to the bench and bar, and also to my brethren themselves, on more careful study of the matter. The fact is, as I must say, *Pietsch v. Milbrath* and *Ludington v. Patton* are in perfect harmony and I think the perverted use of the latter case in the way it appears is a clear oversight.

This is the court's language, referring to the *Ludington Case:*

"Wherein it was held and declared that the statute giving a widow a year after the petition for probate of her husband's will had been filed for electing to take of her husband's estate such portion as the law provides instead of that provided in the will, is a limitation statute, which, when it runs, bars her widow's rights beyond the power of relief by legal or equitable remedies, *in the absence of fraud entitling her to relief upon the ground of equitable estoppel.*"

That language is wholly a new expression. The original does not convey the idea suggested of it, and I venture to say the court does not think otherwise and that it was used without carefully studying the logic of the decision.

Here is the language of the case:

"It must be admitted that such statute should be given the same force and effect as any other statute of limitations." (Note the care to repudiate the idea that any different effect can be given to such statute than any other.) "There are no two rules governing such statutes. Equity deals the same with one as with another. It must be held, when fully run in a given case, to have absolutely extinguished the right upon which it has operated, and created in those in whose favor it has run a new right of equal dignity, as regards legal and equitable cognizance, with the one displaced by law."

Can anything be plainer? The court thus closed the discussion:

"Such being the case, the statute in question must be enforced to its full effect, the same as any other limitation act, regardless of the hardship thereby inflicted in any particular case, *unless circumstances exist precluding its being insisted upon under the doctrine of equitable estoppel.*"

Thus it will be seen words carefully used to, for the time, save a question, have been inadvertently turned into language in the court's opinion now, in effect, suggesting that such question was raised and decided contrary to the spirit of all which preceded it and all which followed it in that and subsequent cases. It will be easily seen that "unless circumstances exist precluding its being insisted upon under the doctrine of equitable estoppel" conveys a very different idea than "in the absence of fraud entitling her to relief upon the ground of equitable estoppel." We hardly need suggest, in passing, that even the question raised, as we have seen, was soon after decided against there being any way of escape from the statute on the ground of equitable estoppel and that has been affirmed and re-affirmed and is now again re-affirmed with an exception to fit the particular situation, and similar situations in the future, overturning the doctrine of all the cases that, as said in the *Ludington Case:* "There are no two

rules governing such cases." I cannot look at the matter differently, but hope I state it respectfully.

I should further remark as to the *Ludington Case,* after language quoted practically closing the branch of the case to which it appertained, that the rest of the opinion strongly suggests the impossibility of any defense of estoppel against a limitation statute. The recovery was based on the theory of giving full effect to the statute and holding the defendants liable as trustees for the property they acquired title to through their fraud. They were her confidential advisers and trustees, legally and morally, from the start. They took advantage of their positions, dealing with her, ostensibly, in her interest, but, actually, to obtain an advantage for themselves and those they represented. In that situation, while the statute was regarded as giving them title, the general principles of equity were held to give them the status of trustees for the one they had wronged with obligation to account to the amount of their enrichment through fraud.

So it will be seen how very far the *Ludington Case* is from the facts of this case. Here there was no trust obligation. Appellant had no property of respondent obtained through fraud or otherwise. This was not even an action for damages on the ground of fraud or to enforce a trust created by fraud, even if, in any event, such an action would lie on the facts here. So in any view the sole authority cited by my brethren in support of the decision from which I dissent is entirely foreign to it.